## IN RE NAVADA N., et al.

Court of Appeals of Tennessee,
At Nashville.

March 1, 2016 Session

Filed May 23, 2016

Brandon M. Booten, Murfreesboro, Tennessee, for the appellant, Tommy N.

Wesley Clark, Smyrna, Tennessee, for the appellant, Jennifer C.

Herbert H. Slatery, III, Attorney General and Reporter; Charlotte Davis, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

## OPINION

J. Steven Stafford, P.J., W.S., delivered the opinion of the Court, in which Arnold B. Goldin, and Kenny Armstrong, JJ., joined.

 Both Mother and Father appeal the trial court's decision to terminate their parental rights to two children. The trial court found clear and convincing evidence supporting several grounds against each parent and also found that termination was in the children's best interest. With respect to the grounds for termination, we reverse in part, vacate in part, and affirm in part. Additionally, we affirm the trial court's determination that termination is in the children's best interest, and therefore, affirm the termination of both Mother's and Father's parental rights to the children at issue.

## BACKGROUND

The minor children at issue are Ryan C., born in 2000, and Navada N. (together with Ryan, "the children") born in 2007.[1] Ryan is the biological child of Jennifer C. ("Mother") and an unknown father.[2] Navada is the biological child of Mother and Tommy N. ("Father"). At some point in early 2013, the children had been residing with maternal grandmother when allegations arose that Ryan had been sexually abusing Navada for several months. On August 15, 2013, the Tennessee Department of Children's Services ("DCS")[3] conducted a Child and Family Team Meeting to discuss Ryan possibly being placed in state custody because he could no longer reside with Navada due to the allegations. Mother could not identify any placement option for him. At some point, more allegations arose that Ryan had watched pornography with Father and that both parents admitted to having sex while the children were in the same room asleep. As such, Ryan entered state custody on August 15, 2013. DCS permitted Navada to remain with Mother under an Immediate Protection Agreement ("IPA") providing that Father, after release from his current incarceration, be prohibited from coming into contact with Navada. Subsequently, Mother tested positive for cocaine[4] and admitted to allowing Father to drive Navada to school

---

1. In cases involving termination of parental rights, it is the policy of this Court to remove the names of minor children and other parties in order to protect their identities.

2. Ryan's biological father is unknown and was neither a party to the trial court proceedings nor on appeal.

3. Mother testified at trial that she "called it in" to DCS about Ryan's abuse.

4. According to the petition, the children had previously been adjudicated dependent and neglected on April 16, 2013, after it was discovered that Mother was abusing illegal drugs and not able to provide care and control of the children, and endangering their safety. Presumably, this is the reason why Mother was again drug tested at this time.

one day because she had missed the bus. Navada therefore entered state custody on October 10, 2013. In the subsequent dependency and neglect hearings, both parents consented to a finding that the children were dependent and neglected. Custody of both children was awarded to DCS. Throughout the proceedings in the trial court, both children resided in several foster homes. While Navada was in custody and after a Child and Family Team Meeting; Mother admitted she had been using cocaine and that she wanted to commit suicide. Mother was hospitalized in the Crisis Stabilization Unit on July 7, 2014. At the time of trial in this case, both children were still in state custody and resided in pre-adoptive foster homes.

After the children entered state custody, a series of permanency plans were created. Over the years that the children were in DCS custody, five parenting plans were entered involving the children. All of the parenting plans were ratified by the trial court and required Mother to complete certain action steps. Four of the parenting plans also contained action steps for Father to complete. Eventually, the goals of the plans transitioned from "return to parent" to "exit custody with relative" to "adoption."

On September 11, 2014, the DCS filed a petition in the Juvenile Court of Rutherford County to terminate the parental rights of Mother and Father to Navada and Mother's parental rights to Ryan. DCS alleged the following grounds against both Mother and Father: abandonment by an incarcerated parent for failure to support, abandonment by an incarcerated parent by wanton disregard, abandonment by failure to establish a suitable home, substantial noncompliance with a permanency plan, and persistence of conditions. DCS alleged the following ground against Moth-

er only: abandonment by failure to support. Finally, DCS alleged the following grounds against Father only: abandonment by an incarcerated parent by failure to visit and failure to establish paternity. The petition also asserted that termination was in the children's best interest.

The trial court conducted a hearing on DCS's petition on April 7, May 12, and May 15, 2015. Mother testified first and stated that she is currently incarcerated and has been since February 27, 2015. She stated that she will be released on May 27, 2015. She testified that she had not seen either child since September 2014, approximately six months prior to trial. Her incarceration stems from a sealed indictment for illegally selling Lortab pills in November 2012 for which she was arrested in May 2014. She indicated that she was prescribed Lortab for "back pain," and that she used her social security disability income to pay for the pills. She admitted that, one day before serving her current jail sentence beginning on February 27, 2015, she used crack cocaine.

Much of Mother's testimony revolved around her addiction to cocaine. She testified that she had been to several rehabilitation treatment centers, but that she had developed a pattern over the last several years of getting clean and then relapsing approximately every ninety days. In January 2014, Mother completed an in-patient rehabilitation program at Bradford in Alabama. After her completion, she entered an intensive out-patient treatment program, but relapsed in February 2014 and was discharged from the program. Also during February 2014, Mother incurred a vandalism charge. She testified that she enrolled in two more rehabilitation programs throughout April and May 2014 and completed one of the programs. Still, Mother admitted to using cocaine as late as February 26, 2015. She was hospital-

ized in July 2014 for suicidal ideations and enrolled in yet another treatment program that same month.

Regarding financial support, Mother admitted that she had not paid any support to the children while they were in DCS custody; Mother excused her failure based on the fact that she was never ordered to pay. At one point during her testimony, however, she testified that she "gave them money every other time I had visitation with [Navada]." Mother's testimony appears to mean that she would give $10 or $20 on occasion directly to the children, but she never gave money to DCS or foster parents. Mother stated that she receives $733.00 per month in disability income, but that her benefits were currently on hold due to her incarceration. Mother stated that when the children were residing with her, her monthly rent totaled $136.00. She testified that her rent was currently $68.00 per month and that she had paid in advance so she would be able to return to the apartment after her incarceration. When questioned about whether she could have used the money saved on rent to pay support, Mother indicated that she had the ability to do so but did not because "I wasn't ordered to." Still, Mother testified that she "sometimes" paid $10 or $20 for cocaine.

Regarding the permanency plans, Mother testified that she had completed a psychological evaluation to address inappropriate sexual behaviors around the children and followed its recommendations; showed proof of her disability income; maintained adequate residency and showed proof to DCS; provided a written budget and transportation plan[5] to DCS; provided the information she had concerning the identity of Ryan's father; contin-

ued individual counseling and medication management; followed all recommendations of the therapist and took medications as prescribed; continued to visit her primary care physician for her seizures and developed a safety plan; completed a clinical assessment with a parenting component; completed an alcohol and drug assessment; attempted to acknowledge her role in the children's removal; visited Ryan as often as possible while he was in treatment; followed recommendations of the Crisis Stabilization Unit upon release; took medication as prescribed; did not "make promises to either child about what the future holds"; did not discuss the case with either child; signed updated releases so that the new Family Service Worker could request counseling and medical records; and promised to be available to drug screen in another county should the issue arise. Mother conceded that she was unable to fulfill several conditions of the permanency plan, however, such as refraining from the use of illegal drugs and passing drug tests. At one point, she also failed to prohibit Father's contact with Navada, despite his noncompliance with the plans.

Mother was scheduled to be released approximately twelve days after the final day of trial in this matter, which occurred May 15, 2015. She testified that because of her incarceration, she was not in a position to take custody of the children today.

Father testified that he has been incarcerated since January 19, 2014 for a probation violation. Before that, he was incarcerated from April 2013 until September 2013. He expected to be released from his current incarceration in October 2015. He

5. Mother suffers from epilepsy and often experiences seizures. Due to her condition, she does not have a driver's license and, through-

out this case, generally relied on public transportation or DCS to provide transportation.

stated that the underlying charge is fleeing by a motor vehicle incurred in 2007, for which he was sentenced to nine years. He said that he also incurred a charge for the sale of cocaine in 2009 and was sentenced to 6 years, but was released after a year and placed on probation. He testified that he received the charges in Davidson County and moving back to Rutherford County was a violation of either his parole or probation. He also testified that, before he went back to jail in January 2014, he incurred charges for assault against Mother.

Father has not had any visitation with Navada since she entered state custody in October 2013. However, he stated that he regularly writes her letters. Father admitted that he has never paid any child support to DCS for Navada's care. Father's testimony regarding his support for Navada prior to her being placed in DCS custody is somewhat confusing:

Q: ... And during this time, from September 2013 to January 2014, were you paying child support during that time?

A. No, sir.

Q. Why not?

A. I didn't have a job and I wasn't working. I was taking care of her, so I didn't feel no need to pay no child support.

\* \* \*

Q. So were you working at all from September of 2013 to January of 2014?

A. I was working with my—I was doing like side jobs like, you know, cutting yards, something like that.

\* \* \*

Q. And the money you received from those jobs, you would use to help pay for Navada?

A. Yeah. Whatever was needed for her, they got it.

Father stated that he does not have any employment prospects upon his release, but plans to live in a halfway house for about six months. He admitted that he would not be able to have custody of Navada in the halfway house. Thus, considering his release date, he testified that it would be approximately one year before he could resume custody.

Father testified that he has completed several classes in prison since becoming incarcerated in January 2014, including a "Motivated to Change" class, an alcoholism class, a victim impact class, an anger management class, and a class called "Prerelease." He also stated that he was retaking the victim impact class and planned to take a parenting class. He also wanted to enroll in a faith-based life principles class.

Regarding the permanency plans, Father conceded that he did not complete many of the items because he was incarcerated. He stated that DCS never requested a drug screen from him since he had been incarcerated. He admitted that he did not complete a written budget, transportation plan, or proof of income. He did state that he had taken all medications as prescribed for his diabetes, high blood pressure, and congestive heart failure. He also completed a parenting class while incarcerated, and on January 8, 2015, he completed an alcohol and drug education class.

Shannon Patterson, a Family Service Worker for DCS,[6] testified that she was assigned to Ryan's case from August 2013 until December 2013, and Navada's case from October 2013 until December 2013. She testified that, initially, Ryan had been

---

**6.** Ms. Patterson testified that her current position with DCS is programs coordinator.

However, at the times relevant to this case, she was a family service worker.

placed in a treatment facility in east Tennessee, which was more difficult on Mother to attend visitation with him. Still, she stated that DCS was able to secure funding so Mother could travel to Ryan's facility via bus. Mother visited Ryan in August, but no visitations were scheduled for September. Eventually, in October 2013, Ryan was placed in a facility in middle Tennessee called Cedar Grove. Mother visited once in October. In November, DCS scheduled two visitations, but both were cancelled due to Mother testing positive for cocaine.

Regarding satisfying the items on the permanency plan, Ms. Patterson testified that Mother was able to complete a number of items, but Father did not. Throughout her time on the case, she was able to maintain regular contact with Mother, but had difficulty communicating with Father. She eventually gained contact with Father at some point in November 2013 and told him about the impending creation of a permanency plan. According to Ms. Patterson, Father indicated that he would call her back, but he did not. Instead, Ms. Patterson mailed a notice to him providing the date of the meeting to create the plan. As indicated above, a new plan was developed on October 24, 2013.

Ms. Patterson noted, however, that Mother's home was "appropriate." She testified that the home was neat and clean and that Mother had bedding for the children. She also testified that Mother provided a copy of proof of her disability income, proof of her lease, and a written budget. Mother was also able to complete the alcohol and drug assessment. Regarding a transportation plan, Ms. Patterson testified that Mother had issues determining a plan due to her seizures and inability to travel alone. She stated that Mother also was able to fulfill the requirement of passing drug screens. According to Ms.

Patterson, DCS expended efforts with Mother by maintaining contact, providing drug screens, setting up assessments, and requesting bus tickets for transportation to various places. It also funded the therapeutic visitations with Navada, provided a walk-through inspection of Mother's home, mailed various notices, mailed copies of permanency plans, and answered questions that Mother asked.

Ms. Patterson stated that Father generally did not comply with the plan's requirements. She stated that Father maintained his issues with drug abuse and failed to resolve legal issues. She testified that he did not provide proof of income, a budget, or a transportation plan. Ms. Patterson stated that Father was difficult to contact. After Navada's removal, Ms. Patterson attempted to contact Father at various phone numbers and addresses with no success. She stated that she attempted to contact him via mail and keep him apprised of the date scheduled for development of a permanency plan for Navada. She testified that she only spoke with him in November when she was doing a visit to Mother's home. Father had called Mother's home, and Ms. Patterson stated that she asked to speak with him. According to Ms. Patterson, she informed Father of the development of the permanency plan, asked if he wished to participate, and Father "just told me he would call me back." She testified that her contact information was located on all of the plans sent to Father. However, Ms. Patterson stated that Father never called her back.

Stephanie Spurgeon, another Family Service Worker for DCS, also testified. She noted that Mother was compliant with some aspects of the permanency plans, but remained unable to consistently pass drug screens. Regarding support, she said that Mother asked DCS to provide Ryan with necessities like socks and underwear. She

testified that Mother did not buy those things, and instead bought Ryan sneakers and a tablet computer. Mother also gave Navada gifts, according to Ms. Spurgeon. Ultimately, Ms. Spurgeon said that, at one point, Mother said she was "cooking drugs for money" in the home, but the home was otherwise clean. She testified that Mother never paid support to DCS. She also indicated that, although Mother had created a budget, it was not adequate to provide for the children because DCS was providing dollar bus tickets to Mother. Thus, according to Ms. Spurgeon, Mother still needed to show proof of adequate income.

Like Ms. Patterson, Ms. Spurgeon testified that she also had minimal contact with Father. She stated that Father began consistently sending letters for DCS to give to Navada in February 2014, approximately one month after he became incarcerated. She had discussed the permanency plan with Father in May 2014, while he was incarcerated. Ms. Spurgeon stated that she mailed all subsequent permanency plans to Father. However, she stated that Father's incarceration served as an impediment to his completion of many of the items on the plan.

Navada's foster father, Joseph H. ("Navada's Foster Father"), testified that Navada had been residing with him and his wife since January 2015. He stated that they are addressing Navada's emotional issues through medication, in-home counseling totaling four days per week, and outpatient therapy every two weeks. He indicated that Navada had "severe tantrums" and bonding issues, but she has significantly improved in the last several months. Currently, Navada participates in ballet and karate. According to Navada's Foster Father, she also plays outside with chalk and her bicycle. They plan to enroll Navada in a math and reading tutoring program. Navada is also enrolled at

the YMCA, where they plan for her to attend summer camp. Additionally, they plan to enroll Navada at a cooking camp at Whole Foods and an acting camp. She is currently in second grade, and he sees no reason why she would not progress to third grade. He stated that he and his wife love Navada and want to adopt her when and if she becomes available.

Navada's Foster Father testified that she has received several letters from Father. The letters are given to DCS, then to Navada's therapist, and the therapist goes through the letters with her. Navada has only seen two of the letters that Navada's Foster Father is aware of because they are usually not appropriate. Regardless, he testified that Navada does not talk about Father much, but does talk about Mother. He stated that Navada has not visited with Mother since she has been in his home because of Mother's drug use. Navada "goes through moments" where she misses Mother and ends up in a tantrum, but they are working on controlling these issues in therapy.

Debra S. ("Ryan's Foster Mother") testified that Ryan, currently 14 years old, has been living in her home for four months. She stated that Ryan attends therapy two times per week. He is currently doing well in middle school. He is not currently involved in any extracurricular activities, but plans to attend football camp this summer. Ryan's Foster Mother described him as quiet and "laid back." She said that he is very neat and clean, even ironing his own clothes.

Ryan's Foster Mother testified that Ryan was involved in an altercation a week before trial where another child at school pushed him. According to Ryan's Foster Mother, Ryan retaliated and was placed "on a diversion" until age eighteen for unruly conduct because it took five officers to pull him off the child. She also disci-

plined him at home for his conduct and prohibited him from outside activities.

She testified that adopting Ryan is a viable option and that she is able to love and care for him. Still, she noted that Ryan has expressed to her that he would prefer to be back in his Mother's home, but understands why that is not an option currently. She testified that Ryan maintains a relationship with his extended family, and she stated that she would encourage Ryan to continue visiting his extended family even if she adopted him. Ryan's Foster Mother testified that Ryan told her that if he cannot return to Mother, he would like to stay with her.

At the conclusion of trial on May 15, 2015, the trial court orally ruled in favor of terminating Mother's parental rights to both children and Father's parental rights to Navada. On July 17, 2015, the trial court entered a written order finding sufficient evidence to support the following grounds against Mother: abandonment by an incarcerated parent for failure to support; abandonment by incarcerated parent by wanton disregard; abandonment by failure to provide a suitable home; persistent conditions; substantial noncompliance with a permanency plan. The trial court's written order provided that sufficient evidence existed to support a finding of the following grounds against Father: abandonment by an incarcerated parent by failure to visit; abandonment by an incarcerated parent for failure to support; abandonment by incarcerated parent by wanton disregard; abandonment by fail-

ure to provide a suitable home; and substantial noncompliance with a permanency plan. The trial court found that DCS did not put on proof regarding failure to establish paternity and abandoned this ground at trial. Additionally, the trial court found that it was in the children's best interest to terminate Mother's and Father's parental rights. Mother and Father both appealed.[7]

## ISSUES

Mother raises only one issue in her brief, which we have restated slightly:

1. Whether the trial court erred in finding that termination of her parental rights was in the children's best interest.

Father raises two issues in his brief, which we have again restated slightly:

1. Whether the trial court erred in finding that the grounds for termination of his parental rights were supported by clear and convincing evidence; and

2. Whether the trial court erred in finding that termination of his parental rights was in the children's best interest.

Although Mother does not raise the issue of grounds for termination on appeal, the Tennessee Supreme Court recently held that that in order to protect the due process rights of parents facing termination of their parental rights, "the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on

---

**7.** At oral argument on March 1, 2016, there was some concern that the trial court's judgment was not final because the trial court's order did not reflect its oral ruling finding that the ground of persistent conditions does not apply to Father. Accordingly, the parties were directed to enter an amended written order directly addressing the ground of persistent conditions as to Father. The trial

court entered an amended order on May 13, 2016, specifically finding that the ground of persistent conditions did not apply to Father. The amended order, in all other respects, was identical to the trial court's initial order. Accordingly, we will generally refer to "the trial court's order" or the like, throughout this Opinion.

appeal." *In re Carrington H.*, 483 S.W.3d 507, 525 (Tenn.2016) (footnote omitted) (citing *In re Angela E.*, 303 S.W.3d 240, 251 n. 14 (Tenn.2010)), *petition for cert. filed* (U.S. Apr. 27, 2016). Accordingly, in addition to the issue specifically raised and briefed by Mother, we will also consider whether the trial court erred in finding clear and convincing evidence regarding each ground alleged against her in the trial court. Furthermore, although we will discuss the law pertaining to the issues raised by both parents, we analyze the law as it applies to each parent individually.

### STANDARD OF REVIEW

■ As recently explained by the Tennessee Supreme Court:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn.2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547–48 (Tenn.1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn.1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. " '[T]he [S]tate as *parens patriae* has a special duty to protect minors....' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn.Ct.App.1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*Carrington*, 483 S.W.3d at 521 (footnote omitted).

■ Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn.Ct.App.2013) (quoting *In re W.B.*, Nos. M2004–00999–COA–R3–PT, 2005 WL 1021618, at *7 (Tenn.Ct.App. Apr. 29, 2005)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn.Code Ann. § 36–1–113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn.2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn.2002).

■ Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. Consequently, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn.Code Ann. § 36–3–113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable ... and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn.Ct.App.2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.* at 653.

■ As recently opined by the Tennessee Supreme Court:

The trial court's ruling that the evidence sufficiently supports termination of pa-

rental rights is a conclusion of law, which appellate courts review *de novo* with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d [387,] 393 [ (Tenn.Ct.App.2009) ] (quoting *In re Adoption of A.M.H.*, 215 S.W.3d [793] , 810 [ (Tenn.2007) ]). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*Carrington H.*, 483 S.W.3d at 523–24.

 When the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn.1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn.Ct.App.1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *Walton v. Young*, 950 S.W.2d 956, 959 (Tenn.1997).

## Analysis

### Grounds for Termination

#### *Abandonment Generally* [8]

We begin with the ground of abandonment generally. In this case, DCS alleged abandonment under Tennessee Code Annotated Section 36–1–113(g)(1) against both parents. Tennessee Code Annotated Section 36–1–102 provides several definitions for "abandonment." Section 36–1–102 defines "abandonment," in relevant part as follows:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or a guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or a guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child; . . . .

(ii) The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37–1–102, and the child was placed in

---

8. Although we are directed to review each ground alleged in the petition even if a parent does not raise that ground on appeal, the Tennessee Supreme Court has never explicitly stated whether "abandonment" is one ground with several definitions, *see* Tenn.Code. Ann. § 36–1–102(1)(A); *In re Kaliyah*, 455 S.W.3d 533, 547 (Tenn.2015) (referring to "abandonment" generally as a single ground for termination), or whether each definition of abandonment presents a separate and distinct ground for review. *See In re Adoption of Angela E.*, 402 S.W.3d 636 (Tenn.2013) (purporting to analyze abandonment by willful failure to support and abandonment by willful failure to visit as separate grounds for termination); *see also In Re Jayden B.T.*, No. E2014–00715–COA–R3–PT, 2015 WL 3876573, at *9 (Tenn.Ct.App. June 23, 2015), *perm. app. denied* (Tenn. Sept. 25, 2015) ("This statutory definition of abandonment contains several distinct grounds."). In an abundance of caution, we review each definition of abandonment alleged in the petition and found by the trial court.

the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department;

\* \* \*

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the

parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn.Code Ann. § 36–1–102(1)(A)(i)–(iv).

In order for a court to terminate a parent's parental rights on the ground of abandonment, that abandonment must be willful. In *In re Audrey S.*, 182 S.W.3d 838 (Tenn.Ct.App.2005), this Court discussed willfulness in the context of termination of parental rights cases:

> The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36–1–102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months.... In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing....

> \* \* \*

> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. *In re M.J.B.*, 140 S.W.3d at 654; *see also Shorter v. Reeves*, 72 Ark. App. 71, 32 S.W.3d 758, 760 (2000); *In re B.S.R.*, 965 S.W.2d 444, 449 (Mo.

Ct.App.1998); *In re Estate of Teaschenko*, 393 Pa.Super. 355, 574 A.2d 649, 652 (1990); *In re Adoption of C.C.T.*, 640 P.2d 73, 76 (Wyo.1982). . . .

The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*In re Audrey S.*, 182 S.W.3d at 863–64 (internal citations and footnotes omitted). "Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810). As previously discussed, this Court reviews questions of law de novo with no presumption of correctness. *Id.* We next turn to the types of abandonment alleged against Mother and Father in this case.

Specifically, the trial court found sufficient evidence to support the following types of abandonment against Mother: abandonment by failure to support, abandonment for failure to provide a suitable home, abandonment by an incarcerated parent for failure to support, and abandonment by an incarcerated parent for wanton disregard. With respect to Father, the

trial court found sufficient evidence to support the following types of abandonment: abandonment for failure to provide a suitable home, abandonment by an incarcerated parent for failure to support, abandonment by an incarcerated parent for failure to visit, and abandonment by an incarcerated parent for wanton disregard. We next turn to address the relevant timeframes as considered for each parent.

### Abandonment by Willful Failure to Support [9] as Alleged against Mother

■ We begin with abandonment by willful failure to support as alleged only against Mother. Section 36–1–102 provides that one definition of abandonment is satisfied when a parent has "willfully failed to support or ha[s] willfully failed to make reasonable payments toward the support of the child." The statutory definition of "abandonment" under Section 102(1)(A)(i) requires us to focus on the "period of four (4) months immediately preceding the filing of a proceeding or pleading to terminate the parental rights[.]" Tenn.Code Ann. § 36–1–102(1)(A)(i); *see also In Matter of M.J.J.*, No M2004–02759–COA–R3–Pt, 2005 WL 873305, at *5 (Tenn.Ct.App. Apr. 14, 2005) (noting the "relevant four month period that we must be concerned with"). Accordingly, with respect to the ground of abandonment by willful failure to support, the relevant time frame for

9. This Court experienced considerable difficulty in determining the appropriate grounds to consider in this case because of discrepancies between the petition, the trial court's oral ruling, and the written order in this case. For example, the petition specifically alleges abandonment by willful failure to support, but the trial court's written order includes no such heading or specific findings as to this ground, despite orally ruling upon it. Instead, the trial court's final order appears to consider abandonment for willful failure to support under the heading of abandonment by an incarcerated parent for failure to support. Despite using this heading, the statutes cited by the trial court refer to abandonment for failure to support without reference to incarceration. Because of the grave consequences and high stakes in termination cases, trial courts should endeavor to be as specific as possible in their orders and treat each definition of abandonment as a separate ground for which specific findings are required.

reviewing Mother's conduct is May 11, 2014, through September 10, 2014.

A parent willfully fails to support her child when, for a period of four months preceding the filing of the termination petition, the parent fails to provide monetary support or fails to provide more than "token payments" toward the support of the child. Tenn.Code Ann.§ 36-1-102(1)(D) (defining "willfully failed to support" and "willfully failed to make reasonable payments toward such child's support"). "Token support" is support that, considering the individual circumstances of the case, is "insignificant given the parent's means." *Id.* at (1)(B).

In both its oral ruling and its written order, the trial court concluded that sufficient evidence existed to support this ground. With respect to this ground, the trial court's oral ruling includes detailed factual findings concerning Mother's gifts to Navada, Mother's continued purchase of illegal drugs, and a general discussion of her income and expenses. However, this Court is concerned that none of the trial court's oral factual findings appear in the trial court's written order as written or are incorporated by reference therein. Tennessee law is clear that the trial court speaks through its written orders, not the transcript. *Williams v. City of Burns*, 465 S.W.3d 96, 119 (Tenn.2015). Our review is therefore hampered by the omission of specific factual findings in the trial court's written order. We decline to supplement the trial court's sparse written order with its oral rulings. It is not the role of this Court to parse the record in search of clear and convincing evidence to support DCS's case or to make factual findings where the trial court fails to do so. *See also State v. McBee*, No. M2003-01326-COA-R3-PT, 2004 WL 239759 at *6 (Tenn.Ct.App. Feb. 9, 2004) (noting that when a trial court fails to make findings of

fact on an issue "we cannot simply review the record de novo and determine for ourselves where the preponderance of the evidence lies"). The role of this Court is an error-correcting court, and our review is limited to the trial court's written findings and conclusions. *Smith v. Gore*, 728 S.W.2d 738, 746–47 (Tenn.1987). This is especially true in light of Tennessee Code Annotated Section 36-1-113(k)'s requirement that trial courts enter written orders containing specific findings of fact and conclusions of law in termination cases. A trial court's failure to comply with subsection (k) "fatally undermines the validity of a termination order." *In re S.M.*, 149 S.W.3d 632, 639 (Tenn.Ct.App.2004).

Our Supreme Court recently opined on the significance of evidence concerning a parent's income and expenses when the ground of abandonment by willful failure to support is alleged. *In re Adoption of Angela E.*, 402 S.W.3d 636, 641 (Tenn. 2013). Here, although the trial court orally ruled upon this ground as to Mother, making factual findings concerning her income and expenses, the written order does not reflect these findings. In fact, the written order includes no more than mere legal conclusions. In holding that a trial court's findings were insufficient, this Court has previously explicitly held that "the trial court is the proper court to make a determination of willfulness." *In re K.M.K.*, No. E2014-00471-COA-R3-PT, 2015 WL 866730, at *4 (Tenn.Ct.App. Feb. 27, 2015) (citing *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn.2003)). Similarly, we decline to conclude that mere legal conclusions fulfill the trial court's obligations or are sufficient to satisfy the directive of Tennessee Code Annotated Section 36-1-113(k). While such failure would normally necessitate a remand to the trial court, such is not necessary with this case because another valid ground for termination

exists. Accordingly, we vacate the trial court's determination with regard to this ground as to Mother.

### Abandonment by Failure to Provide a Suitable Home as Alleged against Mother and Father

The trial court found that both Mother and Father abandoned the children by willfully failing to establish a suitable home. Relevant to this argument, Tennessee Code Annotated Section 36–1–102(1)(A)(ii) indicates that abandonment may be found when:

The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37–1–102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suit-

able home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department; . . . .

■ A suitable home "requires more than a proper physical living location." *In re Hannah H.*, No. E2013–01211–COA–R3–PT, 2014 WL 2587397, at \*9 (Tenn.Ct. App. June 10, 2014) (quoting *State v. C.W.*, No. E2007–00561–COA–R3–PT, 2007 WL 4207941, at \*3 (Tenn.Ct.App. Nov. 29, 2007)). "It requires that the home be free of drugs and domestic violence." *Id.*

The trial court found that DCS made reasonable efforts to assist both Mother and Father with maintaining a suitable home for the children. The trial court further found that Mother and Father have made no reasonable efforts to provide a suitable home and that a suitable home will likely not be provided in the near future. The trial court's order further states: "[Father] evaded the Department and did not do [sic] make any efforts to establish a suitable home in the first four months after Navada was removed. In fact, [Father] became incarcerated in January, 2014, where he remains at trial. [Mother] failed to establish a suitable home for Ryan between August 15, 2013 and December 15, 2013 and between October 10, 2013 and February 10, 2013 for Navada."

As stated above, Section 36–1–102(1)(A) requires that when a termination petition is based on the ground of abandonment by failure to provide a suitable home, DCS must "for a period of four (4) months following the removal," make reasonable efforts to assist the parents with establishing a suitable home for the children. Here, Ryan was removed from Mother's home on August 15, 2013. Thus, the rele-

vant period for considering this ground's application against Mother for Ryan is August 16, 2013, through December 15, 2013. Navada was removed on October 10, 2013. The relevant time period for considering this ground's application against Mother and Father is October 11, 2013, through February 10, 2014.[10]

█ We begin with Mother. Again, Mother does not dispute this ground, but we are obligated to review it on appeal based on the Tennessee Supreme Court's directive in *In re Carrington H.*, 483 S.W.3d 523–25 (directing the Court of Appeals to review the trial court's findings as to each ground alleged in the petition for termination regardless of whether the parent challenges the findings on appeal). We agree with the trial court's finding that DCS has made reasonable efforts to assist Mother in establishing a suitable home for the children. In the relevant months as stated above, DCS provided Mother with at least nine drug screens. Of the nine opportunities to show that her home and life were drug-free, Mother failed five screens, admitted to using cocaine before two screens, and failed to show up for two screens. Throughout the proceedings, DCS continually maintained contact with Mother, provided her with drug screens, and assisted her with coordinating drug and alcohol assessments. We agree with the trial court that DCS expended reasonable efforts to assist Mother with establishing a suitable home.

Although all of the witnesses from DCS testified that Mother's home was neat and clean, the record is clear that Mother has been unable to cease her abuse of cocaine. At one point, Mother admitted to DCS that she had been "cooking dope" in the home for money. At trial, Mother admitted that she has established a pattern of staying clean for approximately ninety days before relapsing. Thus, while the evidence shows that Mother has established a "proper physical living location," the record clearly and convincingly demonstrates that Mother's home is not free of drugs. *Hannah H.*, 2014 WL 2587397 at *9 (quoting *State v. C.W.*, 2007 WL 4207941, at *3). Furthermore, although Mother testified that she has maintained her apartment, at the time of trial, she was incarcerated and could provide no home for the children, suitable or otherwise. Accordingly, we affirm the trial court's ruling that Mother failed to establish a suitable home for the children.

█ We next turn to whether clear and convincing evidence demonstrates that Father also failed to establish a suitable home for Navada. Father asserts that this ground is inapplicable to him because he did not have custody of Navada when she was removed and placed into DCS custody. He argues that the ground of abandonment for failure to establish a suitable home cannot apply to him because Navada was not removed from his custody at the time she entered DCS custody. Additionally, Father alleges that DCS admittedly could not provide reasonable efforts to assist him in establishing a suitable home because of his incarceration. To support these propositions, Father cites to *In re Jamel H.*, No. E2014–02539–COA–R3–PT, 2015 WL 4197220 (Tenn.Ct.App. July 13, 2015). The *Jamel* Court ultimately held that the ground of abandonment by failure to establish a suitable home was not applicable to the child's father in that case because "[the child] was removed from Mother's care [rather than Father's] and

10. Again, the trial court's order provides an incorrect recitation of the four-month period with regard to Mother.

... DCS could not assist Father in establishing a suitable home while he was incarcerated." *Id.* at *7. Although the brief of DCS argues that *Jamel* is distinguishable for other reasons, it does not address the threshold issue of whether Navada must have been removed from Father's custody for this definition of abandonment to apply.

In addition to the *Jamel* case cited by Father, our own research has revealed several intermediate appellate cases addressing the issue and supporting the proposition that the child must have been removed from the parent at issue's home before being placed with DCS in order for DCS to rely upon this ground. *See, e.g., In re K.M.K.*, No. E2014–00471–COA–R3–PT, 2015 WL 866730, at *5 (Tenn.Ct.App. Feb. 27, 2015) ("The statute requires proof that the [C]hildren were removed from the *home* of the parent whose parental rights are sought to be terminated."); *In Re Jayden B.T.*, No. E2014–00715–COA–R3–PT, 2015 WL 3876573, at *10 (Tenn.Ct. App. June 23, 2015), *perm. app. denied* (Tenn. Sept. 25, 2015) ("As with abandonment through failure to provide a suitable home, this Court has also held that the ground of persistence of conditions leading to the removal of the child is not applicable when the child was not removed from the *home* of the parent whose rights are at issue."). Based upon relevant case law, we are satisfied that the courts considering this issue have concluded that this ground is inapplicable when the child is not removed from the parent at issue's home before being placed with DCS.

To this end, we must conclude that the record is devoid of any clear and convincing evidence that would demonstrate that Navada was ever removed from Father's home. While the juvenile court's order adjudicating Navada dependent and neglected stripped Father of his legal custody, nothing in that order indicates that Father was actually residing in the home with Navada at the time. Our review of the record reveals that Father maintained a transient lifestyle, and thus, it is unclear whether Father ever provided a home for Navada. In fact, DCS does not appear to dispute the trial court's finding that "there is not proof that the children were removed from [Father's] home."[11] DCS even notes in its brief that "Father was incarcerated on January 14, 2014. Up to this point, Father did not have a home, let alone a suitable one." Thus, Navada could not have been removed from Father's home where he never provided one in the first instance. Consequently, we are unable to conclude that this ground applies based on the dearth of evidence to establish whether Navada was ever removed from Father's home.

### Abandonment by an Incarcerated Parent as Alleged against Mother and Father

In addition to the definitions of abandonment discussed earlier, Tennessee Code Annotated Section 36–1–102(a)(iv) provides additional mechanisms by which abandonment may be proven when the parent is incarcerated at or shortly before the filing of the termination petition. Section 36–1–102(a)(iv) provides that abandonment may be shown by proving that:

A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately

---

11. The trial court made this finding with regard to the ground of persistent conditions, but as stated above, it is similarly applicable to the ground of abandonment by failure to provide a suitable home.

preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child; . . . .

This Court has indicated that the above definition "contains multiple ways of abandonment for termination of parental rights." *In re Kierra B.*, No. E2012–02539–COA–R3PT, 2014 WL 118504, at *8 (Tenn.Ct.App. Jan. 14, 2014). In this case, the trial court found that abandonment by an incarcerated parent was proven by showing willful failure to visit and support, as well as wanton disregard as to Father. Regarding Mother, the trial court found that abandonment by an incarcerated parent was proven by showing willful failure to support and wanton disregard.

As stated by this Court in *In re Audrey S.*, 182 S.W.3d 838 (Tenn.Ct.App.2005):

> The General Assembly's decision to provide two additional tests for abandonment for incarcerated or recently incarcerated parents reflects, in part, the difficulties inherent in proving that a parent has willfully failed to visit or support a child for four consecutive months when the parent was incarcerated during all or part of that time. Incarceration necessarily restricts a prisoner's freedom of movement, and many prisoners have no resources with which to continue paying child support once their crimes and resulting imprisonment have forced them to forfeit their regular jobs. Thus, the parent's incarceration provides a ready-made excuse for his or her failure to visit or support the

child during the four-month period made relevant by the first statutory definition of abandonment. However, the strong public interest in providing procedures for terminating the parental rights of unfit parents does not dissipate simply because a parent's irresponsible conduct has reached the level of criminal behavior and incarceration.

* * *

Tenn.Code Ann. § 36–1–102(1)(A)(iv) also reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child. Incarceration severely compromises a parent's ability to perform his or her parental duties. A parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child. [James G. Dwyer,] *Taxonomy of Children's Rights;* 11 Wm. & Mary Bill Rts. J. [845,] at 958 [ (2003) ]. However, parental incarceration is not an infallible predictor of parental unfitness.

*Id.* at 865–66 (footnotes omitted). Thus, bearing in mind the purpose of Section 36–1–102(a)(iv), we consider this ground as applied to Mother's and Father's circumstances.

### Incarceration as a Condition Precedent

First, we note that pursuant to the plain language of Tennessee Code Annotated Section 36–1–102(a)(iv), abandonment by an incarcerated parent may only apply where the parent is "is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding." DCS alleged several grounds

against Mother that involve abandonment by an incarcerated parent; however, our review of the record reveals no clear and convincing evidence to support a finding that Mother was either incarcerated at the time the termination petition was filed or at any time in the preceding four months. While it is undisputed that Mother was arrested on May 28, 2014, it is also undisputed that Mother did not begin to serve this sentence until February 27, 2015. Although this arrest occurred in the four months preceding the filing of the termination petition, we cannot conclude that Mother's arrest, without more, constituted incarceration within the meaning of the termination statute. Nothing in the record indicates that Mother spent any time in jail following this arrest; for all this Court knows, Mother may have been immediately released following her arrest. Under these circumstances, we decline to conclude that the evidence in the record is sufficient to show that Mother was incarcerated at any time during the four months prior to the filing of the termination petition. This Court has previously stated, regarding Tennessee Code Annotated Section 36–1–102(1)(a)(iv), that "[t]hese additional tests for abandonment apply only if a parent is incarcerated at or near the time of the filing of the termination petition." *In re Audrey S.*, 182 S.W.3d 838, 865–66 (Tenn.Ct.App.2005). Consequently, the trial court erred in applying any of the Tennessee Code Annotated Section 36–1–102(a)(iv) abandonment by an incarcerated parent definitions to Mother. As such, we reverse the trial court's decisions finding that the grounds referencing abandonment by an incarcerated parent for failure to support and for wanton disregard were applicable to Mother.

▉ Unlike Mother's situation, there is no dispute that Father was incarcerated at the time DCS filed the petition to termi-nate his parental rights. Thus, we conclude that the trial court properly considered the abandonment by an incarcerated parent ground contained in Tennessee Code Annotated Section 36–1–102(a)(iv) with regard to Father.

### *Relevant Four–Month Time Period for Abandonment by an Incarcerated Parent*

As previously discussed, the definitions of abandonment contained in Tennessee Code Annotated Section 36–1–102(1)(A)(i) utilize the time period of four months preceding the filing of the termination petition. The relevant four-month period, however, differs for parents who are incarcerated at the time the petition is filed, and have been incarcerated for all or part of the preceding four months before it is filed. Tenn.Code Ann. § 36–1–102(a)(iv). Under this definition, the relevant time period is "four (4) consecutive months immediately preceding such parent's or guardian's incarceration." *Id.*

In the trial court's written order, with respect to the relevant four-month period, the trial court's order appears to take a "kitchen sink" approach to determining the relevant timeframe in which it is to consider the conduct of the parents regarding the varying definitions of abandonment. The order refers to both the typical four month period before the filing of the petition and the four-month period preceding Father's incarceration. The order provides that the "four months preceding Father's incarceration was September 19, 2014[sic] through January 19, 2014." As shown above, both the years and days are incorrectly stated in the order (i.e. Father was incarcerated on January 14, 2014). Despite the trial court's approach to include each possibly relevant timeframe, the statute governing abandonment is

clear that different time periods apply to different definitions.

A brief review of the Father's incarceration record is helpful in determining the relevant four-month period for the issue of abandonment by an incarcerated parent. According to the record, Father was incarcerated from April 2013 until September 6, 2013 and again from January 14, 2014 through the April and May 2015 trial dates in this case, and was expected to be released in October 2015. Thus, it appears that, most recently, Father was not incarcerated for four consecutive months from September 14, 2013, through January 13, 2014. This period represents the relevant four month period with regard to Father's abandonment by willful failure to visit and support for an incarcerated parent.

### Abandonment by Incarcerated Parent for Failure to Support as Alleged against Father

■ With respect to the abandonment definitions requiring incarceration, we begin with failure to support. DCS alleged in its petition that Father willfully failed to support Navada for the four months preceding his most recent incarceration beginning January 14, 2014. However, as with Mother, discussed *supra*, we must conclude that the trial court's order again contains insufficient findings as to whether Father willfully failed to support his daughter. The order omits any reference to Father's income or expenses (i.e. his ability to pay). These omissions are likely due to the lack of evidence presented at trial concerning Father's income, ability to work, or his expenses, such as rent or other obligations. Without such evidence, a finding of willfulness cannot be sustained. *See In re Adoption of Angela E.,* 402 S.W.3d 636, 640–41 (Tenn.2013) (opining that petitioners failed to carry their burden to prove a father willfully failed to support his children when no evidence concerning his income or expenses was presented at trial). Accordingly, we must vacate the trial court's determination with regard to this ground as to Father.

### Abandonment by Incarcerated Parent for Willful Failure to Visit as Alleged against Father

■ Willful failure to visit is defined as "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation[.]" Tenn.Code Ann. 361–102(1)(E). "Token visitation" means that the visitation is so infrequent or of such short duration as to "establish minimal or insubstantial contact with the child." *Id.* at (1)(C). In its petition, DCS alleged this ground against Father only.[12]

12. We note that the trial court's order for this ground relies upon the wrong four-month period preceding Father's incarceration. The order provides: "Father was incarcerated on January 19, 2014. The four months preceding incarceration was [sic] September 19, 2014[sic] through January 19, 2014." Again, the record is abundantly clear that Father's incarceration began on January 14, 2014. Thus, the relevant four-month period for this ground is the four-month period preceding Father's incarceration: September 14, 2013, through January 13, 2014. This Court has indicated that where the grounds of abandonment by an incarcerated parent for willful failure to support or visit are properly alleged in the termination petition, but the trial court relied on the wrong four-month period, the "omission ... require[s] us to [vacate and] remand for findings on that issue." *In re Abbigail C.,* No. E2015–00964–COA–R3–PT, 2015 WL 6164956, at *14 (Tenn.Ct.App. Oct. 21, 2015). In this case, however, unlike *Abbigail*, we conclude that the trial court's error of five days regarding the correct calculation of the four-month period is not determinative. Accordingly, despite the incorrect date as stated in the order, we go on to consider this ground in the interest of providing a speedy resolution for Navada. We also note that Father does not raise this miscalculation as an error on appeal.

The trial court found that Father failed to reciprocate DCS's efforts and failed to comply with the permanency plan, which compliance would have eventually led to him regaining visitation. Accordingly, the trial court concluded that clear and convincing evidence supported this ground.

There is no dispute that Father had no visitation with Navada from September 14, 2013, through January 13, 2014. The only question at issue is whether Father's failure to visit was willful. In the permanency plan dated October 24, 2013, entered shortly after Navada was removed from Mother's home, Father was indeed tasked with "com[ing] forward and present[ing] himself to the courts" before his visitation would be restored. Once Father completed that hurdle, he would be given random drug screens and would have to test negative for any illegal substances. At that point, Father would be awarded therapeutic visitations "until deemed necessary to move to unsupervised [visitations]." Thus, the triggering event for Father to begin visitation with Navada after she entered state custody was for Father to present himself to the court. At the date of entry of this plan, and at the time it was ratified by the trial court in December 2013, Father was not incarcerated. The record shows no reason why, during this period of non-incarceration, Father could not have appeared before the court in an attempt to begin visitation. Indeed, Father waited until February 2014 after he became incarcerated to appear before the Court.[13] At trial, a DCS worker testified that they could not proceed with visitation, despite Father appearing before the court because of his incarceration and DCS's inability to provide drug screens at that time.

Father asserts that he often wrote letters to Navada while incarcerated, and he asserts that "[w]riting letters is all that Father can do while he is incarcerated to maintain a relationship with Navada, and he has worked diligently to maintain such a relationship." We find Father's argument unpersuasive. The statute does not direct this Court to review whether Father did what he could to maintain a relationship with Navada while in prison, but rather, directs us to determine whether, in the four-months preceding his incarceration, Father attempted to visit his daughter. The record is clear that during this time, from September 14, 2013 through January 14, 2014, Father made no attempt to present himself to the court in an effort to regain visitation or otherwise resume visitation with Navada. Only after Father became incarcerated did he begin sending letters to Navada. This last-ditch effort to salvage any relationship with Navada, which occurred outside the four-month period, does not negate his prior failure to comply with the permanency plan's requirements to regain visitation. Indeed, the evidence shows that DCS had extreme difficulty in maintaining contact with Father or obtaining his participation in the creation of the permanency plans. Ms. Spurgeon and Ms. Patterson both testified as to their attempts to secure Father's participation, but Father evaded the opportunities presented. Thus, based on the foregoing, we must conclude that clear and convincing evidence supports the conclusion that Father willfully failed to visit Navada prior to his incarceration.

---

**13.** We also note that it is unclear whether Father's presence was voluntarily. The record indicates that on February 5, 2014, Father was transported from the jail to the juvenile court for a hearing concerning DCS's "Petition for Dependency and Neglect" regarding Ryan and Navada. It is unclear whether Father's presence was a result of him "com[ing] forward and present[ing] himself to the courts" or whether DCS and the jail officials procured his presence.

### Abandonment by Incarcerated Parent Based on Wanton Disregard as Alleged against Father

We next address whether sufficient evidence exists to support the trial court's finding of abandonment based on wanton disregard. Although the trial court found this ground with regard to both Mother and Father, as previously discussed because Mother was not incarcerated at the time the termination petition was filed or shortly before, this ground cannot apply to Mother. We will, therefore, consider this ground only as to Father.

With regard to the ground of abandonment by an incarcerated parent through wanton disregard, this Court has explained:

Incarceration alone is not conclusive evidence of wanton conduct prior to incarceration. *In re Audrey S.*, 182 S.W.3d 838, 866 (Tenn.Ct.App.2005). Rather, "incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." Id. The statutory language governing abandonment due to a parent's wanton disregard for the welfare of a child "reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child" and recognizes that a "parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child." *Id.* Numerous cases have held that a parent's previous criminal conduct, coupled with a history of drug abuse, constitutes a wanton disregard for the welfare of the child. *See, e.g., State v. J.M.F.*, No. E2003–03081–COA–R3–PT, 2005 WL 94465, at *8 (Tenn.Ct.App. Jan. 11, 2005); *In re C. LaC.*, No. M2003–02164–COA–R3–PT, 2004 WL 533937, at *7 (Tenn.Ct.App. Mar. 17, 2004); *State v. Wiley*, No. 03A01–9903–JV–00091, 1999 WL 1068726, at *7 (Tenn.Ct.App. Nov. 24, 1999); *In the Matter of Shipley*, No. 03A01–9611–JV–00369, 1997 WL 596281, at *5 (Tenn.Ct.App. Sept. 29, 1997). "[P]robation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 867–68.

*In re C.A.H.*, No. M2009–00769–COA–R3–PT, 2009 WL 5064953, at *5 (Tenn.Ct.App. Dec. 22, 2009).

We turn to the trial court's order, which provides that sufficient evidence exists to prove that Father exhibited a wanton disregard for Navada. The order correctly provides that "[Father] has been incarcerated since January, 2014 and remains incarcerated at the filing of the petition." Other than the findings regarding the date of Father's incarceration, the only other "finding of fact" with respect to the alleged wanton disregard of Father is a singular sentence providing, "Therefore, before going to jail, both parents engaged in conduct that exhibits a wanton disregard for the children's welfare." Thus, despite the abundance of evidence elicited at trial concerning Father's drug use, charge of selling cocaine, charge of fleeing by a motor vehicle, assault charge, probation violations, and transient lifestyle, the trial court's order omits reference to any factual findings that would support a finding of wanton disregard, in clear violation of Ten-

nessee Code Annotated Section 36–1–113(k). The order is essentially nugatory for purposes of review. Accordingly, based on the trial court's scant order with respect to this ground, we must vacate the trial court's determination that Father exhibited a wanton disregard for Navada.

### Substantial Noncompliance with a Permanency Plan

We next consider the trial court's finding that Mother and Father both failed to substantially comply with the Permanency Plan. Tennessee Code Annotated Section 36–1–113(g)(4) provides that a ground for termination exists where "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4[.]" Further, Tennessee Code Annotated Section 37–2–403 provides, in relevant part:

> Substantial noncompliance by the parent with the statement of responsibilities provides grounds for the termination of parental rights, notwithstanding other statutory provisions for termination of parental rights, and notwithstanding the failure of the parent to sign or to agree to such statement if the court finds the parent was informed of its contents, and that the requirements of the statement are reasonable and are related to remedying the conditions that necessitate foster care placement.

The determination of whether there has been substantial noncompliance with a permanency plan is a question of law, to be reviewed on appeal de novo with no presumption of correctness. *In re Valentine*, 79 S.W.3d 539, 548 (Tenn.2002). Termination of parental rights under Tennessee Code Annotated Section 36–1–113(g)(2) "requires more proof than that a parent has not complied with every jot and tittle of the permanency plan." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn.Ct.App.2004). To succeed under Section 36–1–113(g)(2), DCS "must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656–57 (citing *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn.Ct.App.2003)). Second, DCS must show that "the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d at 657 (citing *In re Valentine*, 79 S.W.3d at 548–49; *In re Z.J.S.*, No. M2002–02235–COA–R3–JV, 2003 WL 21266854, at * 12 (Tenn. Ct.App. June 3, 2003)).

Before we address the merits of this ground, we note that this Court has admonished DCS on several occasions for its failure to clearly outline the parents' statement of responsibilities in a section of the permanency plan. In *In the Matter of Abigail F.K.*, No. E2012–00016–COA–R3–JV, 2012 WL 4038526 (Tenn.Ct.App. Sept. 14, 2012), we noted that the permanency plan used by DCS was "confusing" and set forth a myriad of similar terms all purporting to outline some conduct required of the parent, such as "description of concern," "desired outcomes," and "action steps." *Id.* at *12. We opined that the statement of responsibilities should clearly communicate to the parent: "this is what you must do to regain custody of your child." *Id.* at *13. This Court stated:

> Unfortunately, however, the permanency plan for Abigail nowhere includes a section labeled as the "statement of responsibilities" for Mother. This omission is not a mere technicality. As we have noted in a previous case: "[T]he statute that sets out this ground for

termination states that parental rights may be terminated where there is substantial noncompliance 'with the statement of responsibilities' in the permanency plan." *In re Askia K. B.*, 2011 WL 4634241, at *9 [ (Tenn.Ct.App. 2011) ] (quoting Tenn.Code Ann. § 36–1–113(g)(2)) (emphasis in original). *See also State of Tenn. Dep't of Children's Servs. v. P.M.T.*, No. E2006–00057–COA–R3–PT, 2006 WL 2644373, at *8; 2006 Tenn.App. LEXIS 608, at *23–24 (Tenn.Ct.App. Sept.15, 2006) ("Tenn. Code Ann. § 36–1–113(g)(2) does not require substantial compliance with a permanency plan's '[d]esired outcome[s],' rather it requires substantial compliance with a plan's statement of responsibilities"). Moreover, the statement of responsibilities serves a substantive purpose. If the parent is required to comply with the permanency plan, then the permanency plan should clearly communicate to the parent: this is what you must do to regain custody of your child. That is the purpose of the parent's statement of responsibilities. Thus, the absence of a clearly marked "statement of responsibilities" for Mother in the permanency plan is a significant problem. It is difficult for the Court to find that Mother failed to substantially comply with the plan's

statement of responsibilities if the plan does not contain one.

*Id.* at *13. *See also In re Josephine E.M.C.*, No. E2013–02040–COA–R3–PT, 2014 WL 1515485, at *12 n. 8 (Tenn.Ct. App. Apr. 17, 2014), *perm. app. denied* (Tenn. July 23, 2014); *In re Aiden W.*, No. E2013–01609–COA–R3–PT, 2014 WL 1682903, at *1 n. 1 (Tenn.Ct.App. Apr. 28, 2014), *perm. app. denied* (Tenn. July 14, 2014).

Further, it appears that, despite this Court's admonishment, the permanency plans in this case are largely identical to those found lacking in *Josephine* and *Abigail*. Based on the similarities in the permanency plan from *Abigail* and the five plans before this Court, it appears that DCS has opted to disregard this Court's instruction and forego implementation of a system to create a clear statement of responsibilities for the parents whose rights they seek to terminate.[14] The plans contains the same categories used in *Abigail*, including "description of concern," "desired outcome," and "action steps," all of which are scattered throughout the five lengthy plans included in this record.

The tasks as outlined in the permanency plans were exceptionally difficult for this Court to discern.[15] The record on appeal includes five separate plans, each consisting of approximately thirty pages.[16] Our

---

14. Further, because of DCS's formatting of the plans, it is extremely difficult for this Court, let alone parents, to ascertain what tasks Mother and Father were required to complete over the years that the children were in DCS custody. We also note that Mother exhibited difficulty reading aloud when requested in the trial court. We say this not to embarrass Mother, but to urge DCS to endeavor to create a more useful mechanism for informing parents of their responsibilities in a permanency plan.

15. Indeed, while DCS alleges approximately ten requirements for Father to complete, this

Court uncovered at least sixteen requirements for Father throughout the several plans.

16. Further, in violation of Tennessee Rule of Appellate Procedure 27, which requires citation to specific page numbers in the record, the brief for DCS outlines ten requirements placed on Father citing generally to "(Ex. 2, Ex. 3, Ex. 4, Ex. 5)," effectively directing this Court to search 120 pages to insure that the requirements stated by DCS are actually within the plans and that they were presented clearly to the parents. Father's brief omits any citations to the permanency plans, perhaps based on his confusion of what constituted a requirement of Father within the plans.

confusion is heightened by DCS's failure to include a clear statement of responsibilities, coupled with the myriad, varied plans put in place over the years in this case. Due to DCS's failure to limit Mother's and Father's responsibilities to concrete obligations that at least had the possibility of being accomplished by them,[17] we vacate the trial court's order finding sufficient proof for this ground of termination.[18]

While this Court recognizes the value of DCS and the services it provides to families and children in this State, the fundamental purpose of DCS is negated when it fails to properly execute its mission. Based on the lack of clarity surrounding the plans, we vacate the trial court's finding that sufficient evidence existed to support this ground for termination.

### Persistence of Conditions

Regarding the ground of persistent conditions, the trial court found that sufficient evidence supports this ground against Mother, but not against Father.[OMIT FN] Accordingly, we consider whether the trial court erred finding that clear and convincing evidence supported this ground with respect to Mother only. Persistence of conditions requires the trial court to find, by clear and convincing evidence, that:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at any early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn.Code Ann. § 36-1-113(g)(3).

"A parent's continued inability to provide fundamental care to a child, even if not willful, ... constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, No. W2008–00558–COA–R3–PT, 2008 WL 4613576, at *20 (Tenn.Ct.App. Oct. 13, 2008) (citing *In re T.S. & M.S.*, No. M1999–01286–COA–R3–CV, 2000 WL 964775, at *7 (Tenn.Ct.App. July 13,

---

17. Even more confusingly, some of the action steps are items that the parents would not be able to complete because they did not have custody at the time of the creation of the plan. For example, one of the "Action Steps" provides that "Ryan will participate in individual counseling and be cooperative with services. Ryan will learn effective communication skills, different ways to strengthen the bond with peers and adults, and learn ways to find his self identity." At the time this "Action Step" was promulgated, Ryan was not in Mother's custody, and she would have had little control over something such as teaching Ryan "effective communication skills." It also appears, in this Court's opinion, that the language of several of the Action Steps is too subjective to determine whether completion has occurred, such as what constitutes Ryan's "self identity."

18. While Mother was represented by counsel during the creation of several of the plans, she was not represented for others. In the interest of judicial economy and in the interest of due process for the parents where substantial noncompliance with a permanency plan is alleged, the better practice is to include one document with all of the parent's responsibilities and have the parent sign that document, if the parent is available.

2000)). The failure to remedy the conditions which led to the removal need not be willful. *In re T.S. & M.S.*, 2000 WL 964775, at *6 (citing *State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn.1990)). "Where . . . efforts to provide help to improve the parenting ability, offered over a long period of time, have proved ineffective, the conclusion is that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.* The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re A.R.*, No. W2008–00558–COA–R3–PT, 2008 WL 4613576, at *20 (Tenn.Ct.App. Oct. 13, 2008) (quoting *In re D.C.C.*, No. M2007–01094–COA–R3–PT, 2008 WL 588535, at *9 (Tenn.Ct.App. Mar. 3, 2008)).

In concluding that the ground of persistence of conditions was proved by clear and convincing evidence, the trial court found that Mother had developed a pattern of drug abuse that had not been sufficiently remedied to allow the children to return to the home at an early date. We agree.

In this case, it is undisputed that both children have been removed from Mother's care for over six months. *See* Tenn.Code Ann. § 36–1–113(g)(3). Despite numerous unsuccessful attempts by Mother to suppress her cocaine abuse, the record clearly shows that she still struggled with addiction throughout the pendency of this case and up until the day before she became incarcerated. We commend Mother for her attempts to cease her cocaine abuse; however, she was given forty-five drug screen opportunities to prove to DCS that she had remedied her addiction issues,

nearly thirty of which she tested positive for cocaine. Although Mother testified that she has not used cocaine since February 26, 2015, this cessation was unquestionably aided by the fact that she became incarcerated the following day and was incarcerated through trial. At trial, Mother admitted that she had established a pattern of "stay[ing] clean for about 90 days, give or take a few days, and then [ ] us[ing] again." While this Court has previously recognized that "[r]ecovery from addiction will frequently entail 'false starts and set backs, as well as successes and, regrettably, blacksliding," Mother has shown that it is uncertain if she will ever be able to stop abusing cocaine, let alone in the near future. *See Abigail*, 2012 WL 4038526, at *17. She also recognized that she was unable to parent her children while using. At the time of trial, Mother was clearly unable to care for the children, and the evidence shows that she had not made a lasting adjustment or change to her lifestyle involving drug abuse. Thus, we affirm the trial court's decision finding clear and convincing evidence to support the ground of persistent conditions.

### Best Interest of the Children

When at least one ground for termination of parental rights has been established, the petitioner must then prove by clear and convincing evidence that termination of the parent's rights is in the child's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn.Ct.App.1994). When a parent has been found to be unfit (upon establishment of ground(s) for termination of parental rights), the interests of parent and child diverge. *In re Audrey S.*, 182 S.W.3d at 877. The focus shifts to the child's best interest. *Id.* Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights

is not always in the child's best interest. *Id.* However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn.Code Ann. § 36–1–101(d). Further, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." *Moody*, 171 S.W.3d at 194.

 The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. These factors include, but are not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to affect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36–5–101.

Tenn.Code Ann. § 36–1–113(i). This Court has noted that, "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M. A. R.*, 183 S.W.3d 652, 667 (Tenn.Ct.App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877. As explained by this Court:

Ascertaining a child's best interests does not call for a rote examination of each of Tenn.Code Ann. § 36–1–113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

Based upon the foregoing discussion, it is clear that both Mother and Father have struggled to make an adjustment of circumstances, conduct, or conditions so as to make it safe and in the children's best interest to be in her care. Despite DCS's efforts, Mother has failed to make a lasting adjustment, as evidenced by the fact that, *inter alia*, she has yet to successfully complete a rehabilitation program and she has had recent incidents of both cocaine abuse and suicidal behavior. It is unclear whether Mother will ever be able to remain clean, as losing custody of her children was clearly not motivation enough. Additionally, Mother and the children have an extensive history with DCS, revolving around Mother's drug use and lack of guardianship over the children. While the children were in custody, Mother was engaging in criminal conduct and described instances where she opted to purchase cocaine instead of sending support payments for her children. Her trial testimony and the testimony of the DCS workers shows that, despite some effort on behalf of Mother, she stills lacks the ability to prioritize her children's needs over her own.

Similarly, Father has done little to make an adjustment of circumstances, conduct, or conditions. It is clear to this Court that it would not be safe for Navada to return to Father at any point in the near future, as evidenced by his sprees of criminal conduct and current incarceration. Although we commend Father for taking advantage of classes offered in his jail, his efforts to parent Navada while not incarcerated were minimal to none. Father admitted that he did not pay child support while Navada was in custody. Similarly, Father's plans upon his release, expected six months after trial, remained uncertain. Father mentioned living in a halfway house for six months after release, which would be reasonable given his situation; however, from the point of view of Navada,

we must conclude that Navada has waited long enough for Father to be a parent to her. Father has not seen Navada since Navada was removed to DCS custody due to his violation of the IPA, nearly a year and a half prior to trial. It is simply not in her best interest to wait longer to foster a relationship with Father that may never occur.

The record indicates that the children have done well in their pre-adoptive foster homes. Ryan's Foster Mother testified that she and Ryan have bonded well and that Ryan is adjusting to life in her household. She stated that Ryan wants to attend football camp, and he is doing well in school. Ryan's Foster Mother also has encouraged Ryan to maintain contact with his extended family, which strengthens his support system. Ryan's Foster Mother stated that she wants to adopt Ryan, and he wants to be adopted by her if Mother cannot remedy her drug abuse issues.

Navada's Foster Father testified that they have also bonded well with Navada. Regarding Navada's relationship with Father, Navada's Foster Father testified that she has not visited with Father due to his incarceration and shows little interest in communicating with Father via letter. Navada is receiving the counseling she needs for her emotional issues, and she is improving in school. According to Navada's Foster Father, Navada participates in ballet and karate, and will be attending several summer camps. He testified that he and his wife love Navada and wish to adopt her.

To remove the children at this point, according to the record, and place them in what is still an unstable environment with Mother and Father would likely have a detrimental effect on the children. Applying the foregoing statutory facts, and for the stated reasons, it is clear that both

parents have failed to make lasting change in their conduct or condition that would allow the children to return to their care at an early date. While this Court does not doubt the parents' love for both children, the record does not support their assertion that they would be able to provide the children with the stable emotion and developmental support that they require at this stage in their young lives. From the totality of the circumstances, we conclude that clear and convincing evidence supports the trial court's conclusion that termination of both Mother's and Father's parental rights is in the children's best interest.

### CONCLUSION

For the foregoing reasons, we affirm the trial court's order terminating both Mother's and Father's parental rights to the children.

With respect to Father's parental rights to Navada, we affirm the trial court's decision finding sufficient evidence to support the ground of abandonment by an incarcerated parent for failure to visit. We vacate the trial court's findings as to Father regarding the grounds of abandonment by an incarcerated parent for failure to support, abandonment by an incarcerated parent for wanton disregard, and for substantial noncompliance with the permanency plans. We reverse the trial court's finding as to the ground of abandonment by failure to establish a suitable home.

With respect to Mother's parental rights to Navada, we affirm the trial court's decision finding sufficient evidence to support the grounds of abandonment for failure to establish a suitable home and persistence of conditions. We reverse the trial court's decision finding support for the ground(s) of abandonment by an incarcerated parent based on failure to support and for wanton disregard. We vacate the trial court's finding as to Mother regarding the ground of substantial noncompliance with a permanency plan.

We affirm the trial court's conclusion that it is in the children's best interest to terminate both Mother's and Father's parental rights, and thus affirm the trial court's ultimate decision to terminate Mother's and Father's parental rights to these children. This case is remanded to the trial court for such further proceedings as may be necessary and are consistent with this Opinion. Costs of this appeal are assessed against Appellants Jennifer C. and Tommy N. Because both appellants are proceeding *in forma pauperis* in this appeal, execution may issue for costs if necessary.