IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 1, 2016

## IN RE:  ADDISON B.

**Direct Appeal from the Juvenile Court for Jefferson County**
**No. 15-00336     Dennis Roach, II, Judge**

_____

**No. E2016-00966-COA-R3-PT – Filed November 30, 2016**

_____

This appeal involves the termination of a father's parental rights.  The father is currently serving an eight-year sentence after pleading guilty to two counts of attempted child rape, with the victims being the child at issue and her older half-sister.  The trial court terminated the father's parental rights upon finding by clear and convincing evidence that six grounds for termination were proven and that termination was in the best interest of the child.  We vacate the trial court's findings as to three grounds but affirm the trial court's findings regarding the remaining three grounds and affirm the best interest finding.  We accordingly affirm the trial court's order as modified and uphold the termination of the father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Vacated in Part, Affirmed as Modified, and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and JOHN W. MCCLARTY, J., joined.

Kimberly Ruth Grace, Jefferson City, Tennessee, for the appellant, R.B.

Herbert H. Slatery III, Attorney General and Reporter, and Rachel Erin Buckler, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

### OPINION

### I. FACTS & PROCEDURAL HISTORY

Addison B. was born in 2007 to married parents, A.B.[1] ("Mother") and R.B.

---
[1]In cases involving a minor child, it is this Court's policy to redact names in order to protect the child's

("Father"). The Tennessee Department of Children's Services ("DCS") became involved with the family in 2012 after receiving a referral of possible sexual abuse. During interviews with DCS case managers, five-year-old Addison and her fifteen-year-old half-sister both disclosed that they had been touched inappropriately by Father on more than one occasion. On December 3, 2012, DCS filed a "Petition for Restraining Order and Petition for Order Controlling Conduct" in the juvenile court of Jefferson County. DCS sought an order declaring the children dependent and neglected and a restraining order preventing Father from having any contact with the children. The juvenile court entered an ex parte restraining order that same day, prohibiting Father from having any contact, personally or through third parties, with the children.

On April 16, 2013, Father was arrested and charged with five counts of rape of a child, with the victims being Addison and her half-sister. On November 15, 2013, the juvenile court entered a "Final Order Restraining Contact between [Father] and Children," which stated that all parties agreed that the children were dependent and neglected. According to the order, Father waived his right to a hearing and stipulated that if DCS presented its proof to support the allegations, it would meet its burden of proof by clear and convincing evidence. The order states that Father agreed to have "absolutely no contact" with the children until they reached the age of eighteen unless the order was modified. Because Mother had successfully completed all court-ordered services, the order provided that the case was closed, but the children would remain within the protective jurisdiction of the court.

Six months later, in May 2014, DCS became involved with the family again. DCS received a referral that Addison was acting out sexually with another child at school. Upon investigation, DCS learned that Father had posted a $350,000 bond and was released from jail in January 2014. He was ordered to remain at home or at his mother's house and was required to wear an ankle monitor. During an interview with Addison, she disclosed that she and Mother were visiting with Father, sometimes overnight, and during those overnight visits Addison would share a bed with Mother and Father. Mother initially denied such contact but was later arrested and pled guilty to making a false report based on her statements to the investigating officer. Based on these developments, DCS filed a "Petition for Temporary Legal Custody and Ex Parte Order" seeking legal custody of Addison. The juvenile court entered a protective custody order placing temporary legal custody of Addison with DCS effective May 3, 2014, and she was placed in foster care. On May 9, 2014, Father was again ordered to have no contact with Addison and was ordered to pay child support in the amount of $100 per week. This amount was later reduced to $60 per month effective July 14, 2014.

---

identity. In this case, in order to preserve both clarity and the anonymity of the child, we will redact the names of individuals sharing the child's surname and will refer to those individuals by their given name and the first letter of their surname.

Father attended a child and family team meeting with DCS on May 29, 2014, but he refused to sign the permanency plan and related documents. The permanency plan required Father to complete sex offender training, complete a psychosexual evaluation, follow all court orders, resolve all current legal matters and refrain from incurring additional charges, contact DCS twice monthly, pay child support, apply for insurance, sign releases, provide proof of reliable transportation, adequate income, and a stable home, and ensure that Addison was safe from abuse and attending school, medical appointments, and counseling.

On August 11, 2014, Father returned to jail upon the revocation of his bond due to his aforementioned violation of the no-contact order regarding Addison. That same day, his first child support payment was made, for the sum of $60. To resolve the charges pending against him for five counts of child rape, in December 2014, Father pled guilty to two counts of attempted child rape and was sentenced to eight years in the custody of the Tennessee Department of Correction. His orders of conviction provided that he was also sentenced to community supervision for life, required to register as a sex offender, and ordered to have no contact with the victims, Addison and her half-sister.

On April 28, 2015, DCS filed a petition to terminate Father's parental rights. By that time, Addison was almost eight years old, and she had been in foster care for just shy of one year. The termination petition alleged that six grounds existed for terminating Father's parental rights: abandonment by an incarcerated parent by failure to pay support; abandonment by an incarcerated parent due to wanton disregard; substantial noncompliance with the permanency plan; persistent conditions; severe child abuse; and sentenced for child abuse. It also alleged that termination was in the best interest of Addison.

The termination case was tried on April 1, 2016. The only witnesses were Father and the DCS family service worker assigned to Addison's case. On April 13, 2016, the trial court entered an order terminating Father's parental rights on all grounds asserted in the petition. Father timely filed a notice of appeal.

## II. ISSUES PRESENTED

On appeal, Father challenges the trial court's findings regarding all six grounds for termination and its conclusion regarding Addison's best interest. For the following reasons, we affirm the decision of the juvenile court as modified and remand for further proceedings.

### III. STANDARD OF REVIEW

"In Tennessee, proceedings to terminate [a] parent's parental rights are governed by statute." *In re Kaliyah S.*, 455 S.W.3d 533, 541 (Tenn. 2015). Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *Id.* at 546. Pursuant to the statute, parties who have standing to seek termination of a biological parent's parental rights must prove two elements. *Id.* at 552. First, they must prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated section 36-1-113(g). *Id.* Second, the petitioner must prove that terminating parental rights is in the child's best interest, considering, among other things, the factors listed in Tennessee Code Annotated section 36-1-113(i). *Id.* In light of the constitutional dimension of the rights at stake in a termination proceeding, the persons seeking to terminate parental rights must prove both of these elements by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). "Clear and convincing evidence" has been defined as "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) (citing *In re Valentine*, 79 S.W.3d at 546). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

In sum, in order to terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Adoption of Angela E.*, 402 S.W.3d at 639. Because of this heightened burden of proof in parental termination cases, on appeal we must adapt our customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). First, we review each of the trial court's specific factual findings *de novo* in accordance with Rule 13(d), presuming the finding to be correct unless the evidence preponderates against it. *In re Adoption of Angela E.*, 402 S.W.3d at 639. Second, we must make our own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016) (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

4

## IV. DISCUSSION

### A. *Grounds for Termination*

### 1. Abandonment by an Incarcerated Parent

The first ground for termination listed in the termination statute is abandonment. *See* Tenn. Code Ann. § 36-1-113(g)(1). For purposes of terminating parental rights, there are five alternative definitions of abandonment. *See* Tenn. Code Ann. § 36-1-102(1)(A)(i)-(v). Subsection (iv) provides "mechanisms by which abandonment may be proven when the parent is incarcerated at or shortly before the filing of the termination petition." *In re Navada N.*, No. M2015-01400-COA-R3-PT, 2016 WL 3090908, at *13 (Tenn. Ct. App. May 23, 2016) (*no perm. app. filed*). In relevant part, it provides that abandonment exists when:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(iv). Clearly, this definition provides "'multiple ways'" to find abandonment by an incarcerated parent. *In re Navada N.*, 2016 WL 3090908, at *13 (quoting *In re Kierra B.*, No. E2012-02539-COA-R3-PT, 2014 WL 118504, at *8 (Tenn. Ct. App. Jan. 14, 2014) (*no perm. app. filed*)). In this case, DCS alleged, and the trial court found, abandonment by willful failure to support and abandonment by wanton disregard. We review each separately.[2]

### a. Failure to Support

When the parent or guardian who allegedly failed to support the child was incarcerated at the time the termination proceeding was instituted, the statute requires us

---

[2]We noted in *In re Navada N.* that it is not entirely clear whether "abandonment" is one ground for termination with several alternative definitions or whether each definition of abandonment presents a separate and distinct ground for review. *See In re Navada N.*, 2016 WL 3090908, at *7 n.8. We will review separately each definition of abandonment alleged in the petition and found by the trial court.

to consider the "four (4) consecutive months immediately preceding such parent's or guardian's incarceration." Tenn. Code Ann. § 36-1-102(1)(a)(iv). Here, Father's first period of incarceration lasted from his arrest on April 16, 2013, until his release on bond on January 13, 2014. He returned to jail on August 11, 2014, when his bond was revoked for his violation of the no contact order, and he remained there when the termination petition was filed on April 28, 2015. Thus, prior to the date of filing, his most recent period of non-incarceration for four consecutive months spanned from April 11, 2014, through August 10, 2014. This period represents the relevant four-month period with regard to the allegation of abandonment by willful failure to support for an incarcerated parent. *See In re Navada N.*, 2016 WL 3090908, at *15 (calculating the most recent period that the parent was not incarcerated without including the date of incarceration); *In re Abbigail C.*, No. E2015-00964-COA-R3-PT, 2015 WL 6164956, at *14 (Tenn. Ct. App. Oct. 21, 2015) (*no perm. app. filed*) (same); *see also In re Jacob C. H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (*no perm. app. filed*) ("[T]he applicable four month window for determining whether child support has been paid in the context of the ground of willful failure to support includes the four months preceding the day the petition to terminate parental rights is filed but excludes the day the petition is filed. In other words, the last day of the four month period is the day before the petition is filed.").

The relevant statutes define the concept of willful failure to support or to make reasonable payments toward support as the willful failure to provide monetary support or "more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). Token support is support that "under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). By its terms, the definition of token support requires consideration of the circumstances of the individual case. *In re K.C.,* No. M2005-00633-COA-R3-PT, 2005 WL 2453877, at *9 (Tenn. Ct. App. Oct. 4, 2005) (citing Tenn. Code Ann. § 36-1-102(1)(B)). A finding that support was "insignificant" in light of the parent's "means" cannot be made without evidence regarding *both* a parent's actual financial support of the child and a parent's "means." *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *11 (Tenn. Ct. App. Jun. 3, 2003). "In the context of token support, the word 'means' connotes both income and available resources for the payment of debt." *In re Adoption of Angela E.*, 402 S.W.3d 636, 641 (Tenn. 2013) (citing *In re Z.J.S.*, 2003 WL 21266854, at *11 n.24; *Black's Law Dictionary* 1070 (9th ed.2009)).

The Tennessee Supreme Court's decision in *In re Adoption of Angela E.*, 402 S.W.3d at 641, is instructive. In that case, the Tennessee Supreme Court found that the petitioners failed to provide clear and convincing evidence of willful failure to support when there was no evidence presented concerning the defendant-father's monthly

6

expenses, even though it was undisputed that he was a physician earning an annual income of $150,000 and owned lien-free property worth at least $300,000. *Id.* The Tennessee Supreme Court deemed the evidence insufficient and reiterated that, in order to prove the ground of abandonment for failure to support, "[a] party seeking termination of parental rights must prove by clear and convincing evidence that the [parent who failed to support] had the capacity to pay support but made no attempt to do so and did not possess a justifiable excuse." *Id.* at 641. Thus, *In re Adoption of Angela E.* illustrates "the significance of evidence concerning a parent's income and expenses when the ground of abandonment by willful failure to support is alleged." *In re Navada N.*, 2016 WL 3090908, at *10.

We likewise conclude that the trial court's order in this case contains insufficient findings regarding whether Father willfully failed to support Addison during the relevant timeframe. The order states, in pertinent part:

> [Father] has kept jobs in the past and has no physical or mental handicaps. After his arrest for five counts of child rape, Mr. Brown posted a $350,000 bond for his release. In the four months prior to his incarceration, Mr. Brown made a child support payment totaling $60. Given the ability of Mr. Brown to work, his knowledge of his duty to provide support, and his lack of justifiable excuse for his failure to provide reasonable support, the support of $60 is considered token.

The lack of additional findings is likely due to the fact that little to no evidence was presented at trial regarding Father's income, ability to work, or expenses. "Without such evidence, a finding of willfulness cannot be sustained." *In re Navada N.*, 2016 WL 3090908, at *15 (vacating a finding of willful failure to support by an incarcerated parent when the order contained no findings regarding the parent's income or expenses). The burden to prove Father's abandonment by willful failure to support rested squarely on DCS as the petitioner. It is not enough for a petitioner to "simply prove that [the parent] was not disabled during the relevant timeframe" and therefore assume that he or she was capable of working and paying child support. *In re Josephine E.M.C.*, No. E2013-02040-COA-R3-PT, 2014 WL 1515485 at *18 (Tenn. Ct. App. Apr. 17, 2014), *perm. app. denied* (Tenn. July 23, 2014).

Here, DCS demonstrated that Father was ordered to pay $100 per week in May 2014, the obligation was reduced to $60 per month in July 2014, and he made his first payment of $60 on the day he returned to jail in August 2014. The DCS case worker testified that she believed this was insignificant given Father's means because he was

able to post a bond for $350,000 in order to be released from jail in January 2014. However, she conceded that she did not know if Father had any jobs during the relevant four-month time period. The order allowing Father's release on bond ordered him to remain at home with the exception of attending doctor's or mental health appointments or visiting his mother's home. Father was wearing an ankle monitor that did not permit him to travel more than fifty feet from his house. The record contains no evidence regarding Father's assets, obligations, or expenses. Father, who was 41 years old at the time of trial, simply testified that "in the past" he had worked as a car salesman, at a plastic company, at a produce store, and building pallets. Without basic information regarding Father's means, we are unable to determine, by clear and convincing evidence, whether Father had the capacity to provide support or lacked a justifiable excuse for failing to do so. Thus, we conclude that DCS failed to prove this ground for termination by clear and convincing evidence and vacate the trial court's finding of abandonment by willful failure to support.

## 2. Wanton Disregard

As noted above, the definition of abandonment for incarcerated parents also provides that abandonment occurs when the parent "engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." Tenn. Code Ann. § 36-1-102(1)(A)(iv). This definition "reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child." *In re Audrey S.*, 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005). Incarceration severely compromises a parent's ability to perform parental duties, and a parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child. *Id.* However, incarceration is not an infallible predictor of parental unfitness. *Id.* Rather, "incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.* The issue is whether the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child. *Id.*

A parent's "poor judgment and bad acts that affect the children constitute a wanton disregard for the welfare of the children." *State, Dep't of Children's Servs. v. Hood*, 338 S.W.3d 917, 926 (Tenn. Ct. App. 2009) (citing *State v. Harville*, No. E2008-00475-COA-R3-PT, 2009 WL 961782, *7 (Tenn. Ct. App. Apr. 9, 2009)). For example, "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a

child." *In re Audrey S.*, 182 S.W.3d at 867-68.

In this case, the trial court found that the ground of wanton disregard was proven by clear and convincing evidence. The trial court found that Father had been arrested and ultimately pled guilty to two counts of attempted child rape, with one victim being the child at issue in this case and the other victim being the half-sister. The trial court recognized that despite his guilty plea, Father now denies any wrongdoing. At trial, Father testified at length about his decision to enter an *Alford* best interest plea in an attempt to maintain his innocence before the court. He also described the instances of alleged abuse and claimed that he was only innocently applying cream to a rash, with no sexual intention or motive. The trial court, in its order, emphasized that it did not intend to relitigate Father's guilty plea to attempted child rape. However, the trial court also explained that it had carefully considered Father's testimony, and that it found, by clear and convincing evidence, that Father did in fact commit the particular act alleged and commit severe abuse. The trial court found that his actions established wanton disregard for the welfare of the minor child. Giving due deference to the trial court's credibility determination, we conclude that the evidence supports the trial court's factual findings, and we agree with the trial court's conclusion that these facts demonstrate a wanton disregard for the welfare of the child. *See, e.g.*, *In re T.L.G.*, No. E2014-01752-COA-R3-PT, 2015 WL 3380896, at *3 (Tenn. Ct. App. May 26, 2015) (*no perm. app. filed*) (concluding that sexual acts against one's own child, leading to a lengthy prison sentence, "without question reflects a wanton disregard for the Child's welfare"); *In re G.M.H.*, No. M2006-02665-COA-R3-PT, 2007 WL 1527003, at *3 (Tenn. Ct. App. May 24, 2007) (finding that sexual abuse and child rape of a step-sibling exhibited wanton disregard for the welfare of the parent's children).

We also note that even after Father was released on bond, he continued to have contact with the child in violation of the no-contact order and even slept in the same bed with her.[3] The no-contact order clearly provided that if it was violated, the child could be removed from her home and her parents' custody. As a result of Father's subsequent contact with Addison, her mother was arrested, and Addison was placed in foster care. These facts further demonstrate Father's wanton disregard for Addison's welfare. We affirm the trial court's finding that this ground for termination was proven by clear and convincing evidence.

---

[3]At trial, Father denied that he had any direct contact with Addison after he was released on bond. However, the trial court found that Mother knowingly allowed Father and Addison to be in the same bed together, indicating that it did not believe Father's claim of no contact. The evidence does not preponderate against the trial court's finding that such contact did in fact occur.

## 2. Substantial Noncompliance

The next ground for termination asserted by DCS and found by the trial court was substantial noncompliance.[4] This ground is found in Tennessee Code Annotated section 36-1-113(g)(2) and applies when "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4." Tenn. Code Ann. § 36-1-113(g)(2). As clearly stated in the statute, in order for a parent's noncompliance to justify the termination of parental rights, it must be "substantial." *In re Angel S.F.*, No. M2012-02089-COA-R3-PT, 2013 WL 1136551, at *5 (Tenn. Ct. App. Mar. 18, 2013). Terminating parental rights based on this ground "requires more proof than that a parent has not complied with every jot and tittle of the permanency plan." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). The petitioner must demonstrate that the parent's noncompliance is substantial considering "the degree of noncompliance and the importance of the particular requirement that has not been met." *Id.* "Substantial" means "of real worth and importance." *In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002) (quoting *Black's Law Dictionary* 1428 (6th ed.1990)). A parent's "[i]mprovement toward compliance should be considered in a parent's favor." *Id.* at 549 (citing *State Dep't of Human Servs. v. Defriece*, 937 S.W.2d 954, 961 (Tenn. Ct. App. 1996)).

In this case, Father participated in a child and family team meeting for the development of a permanency plan on May 29, 2014. However, he refused to sign it because he wanted to speak with an attorney and feared that he might unknowingly sign over his parental rights. Tennessee Code Annotated section 37-2-403(a)(2)(C) provides that substantial noncompliance by a parent with the statement of responsibilities in a permanency plan provides grounds for terminating parental rights "notwithstanding the failure of the parent to sign or to agree to such statement if the court finds the parent was informed of its contents, and that the requirements of the statement are reasonable and are related to remedying the conditions that necessitate foster care placement." "Conditions necessitating foster care placement may include conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547. "Terms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant." *Id.* at 548-49. We therefore turn to whether the requirements of the permanency plan were reasonable and related to remedying the conditions that necessitated foster placement.

---

[4]Even though the termination statute only requires the existence of one ground to justify terminating parental rights, our supreme court has instructed the court of appeals to review the trial court's findings of fact and conclusions of law as to each ground for termination asserted, in order to further the policies of permanently placing children, reaching just and speedy resolutions of cases, and preventing unnecessary remands of cases heard by the supreme court. *In re Angela E.*, 303 S.W.3d 240, 251 n.14 (Tenn. 2010). Therefore, we will proceed to consider the other grounds for termination found by the trial court.

By the time the May 29, 2014 permanency plan was ratified by the court on October 1, 2014, Father had already returned to jail due to revocation of his bond. Although amended permanency plans were entered thereafter, they did not alter Father's responsibilities in light of his incarceration. The permanency plan required Father to complete sex offender training, complete a psychosexual evaluation, follow all court orders, resolve all current legal matters and refrain from incurring additional charges, contact DCS twice monthly, pay child support, apply for insurance, sign releases, provide proof of reliable transportation, adequate income, and a stable home, and ensure that Addison was safe from abuse and attending school, medical appointments, and counseling. Some of these requirements were clearly unreasonable given Father's incarceration and the no-contact order. Father was listed as one of the persons responsible for ensuring that Addison attended school and appointments and was safe. However, it is difficult to understand how Father could be expected to comply with these responsibilities under the circumstances, as he had no control over Addison or her caregivers.

Father either complied or attempted to comply with other requirements. He testified that he has always had suitable housing, and the DCS case worker's testimony confirmed that Father had a home and that there was no indication that he would not have a stable home upon release. He was earning a miniscule income while in jail, was paying child support, and was current on his obligation at the time of trial. No evidence was presented to suggest that Father did not have adequate transportation.[5] The record does not reflect that Father failed to follow court orders or incurred any additional charges after the permanency plan was entered. He testified that he had no disciplinary infractions while in jail. Although Father failed to complete a psychosexual evaluation or sex offender training and did not maintain twice monthly contact with DCS, the record contains no clear evidence indicating that Father would have been able to complete these requirements while incarcerated. At trial, the DCS case worker vaguely asserted that the prison system could assist Father with anything that would be required in a permanency plan, but she later admitted that she had trouble getting in touch with the prison system herself and was not even allowed to meet with Father when she attempted to visit to review the permanency plan with him. She was unable to tell Father about the prison programs that might be available to him. Despite this, Father testified that he was enrolled in a program to obtain his GED and seven to eight other programs, spanning all day, five days per week, including some programs specifically designed for fathers. Father believed these programs would help him become a better parent. There is no indication that Father turned down any services that were available to him, and he testified that he was taking all the programs he could.

---

[5]The permanency plan referred to the requirements of transportation, a permanent home, and adequate income as "guidelines and policies which must be followed when a child is in state's custody."

When considering this ground for termination, "[o]ur focus is on the parent's efforts to comply with the plan, not the achievement of the plan's desired outcomes." *In re Aiden R.*, No. E2015-01799-COA-R3-PT, 2016 WL 3564313, at *9 (Tenn. Ct. App. June 23, 2016) (*no perm. app. filed*) (citing *In re B.D.,* No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009)). "Clearly in most situations an incarcerated parent is going to be unable to complete at least some significant portion of the permanency plan." *In re Jonathan F.*, No. E2014-01181-COA-R3PT, 2015 WL 739638, at *13 (Tenn. Ct. App. Feb. 20, 2015) (*no perm. app. filed*). "'An incarcerated parent is not absolved of his or her parental responsibilities while in jail or prison. However, incarceration is a relevant consideration when judging that parent's ability to fulfill his or her responsibilities to the child.'" *In re Aiden R.*, 2016 WL 3564313, at *9 (quoting *In re Jonathan F.*, 2015 WL 739638, at *13); *see, e.g.*, *In re M.B.R.*, No. E2015-01906-COA-R3-PT, 2016 WL 3568183, at *5 (Tenn. Ct. App. June 23, 2016) (*no perm. app. filed*) (declining to find substantial noncompliance "given the fact that [the parent's] incarceration inherently restricted his access to the means to address some of his requirements"). Although Father certainly failed to comply with some requirements of the permanency plan, considering his efforts under the circumstances, the evidence does not clearly and convincingly establish that Father's noncompliance with the reasonable requirements was substantial. We therefore vacate the trial court's finding that this ground for termination was proven by clear and convincing evidence.

## C. Persistent Conditions

The next ground asserted by DCS and found by the trial court is persistent conditions. The statutory ground for termination that is commonly referred to as "persistent conditions" is defined in Tennessee Code Annotated section 36-1-113(g)(3) as existing when:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and
>
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable

and permanent home[.]

As the statute indicates, for this ground to apply, the child must "ha[ve] been removed from the home of the parent or guardian by order of a court for a period of six (6) months." Tenn. Code Ann. § 36-1-113(g)(3). We have previously held that the order removing the child must be "based on a judicial finding of dependency, neglect, or abuse." *In re Audrey S.*, 182 S.W.3d at 874. Accordingly, in considering whether the ground of persistent conditions has been established, we begin by examining the orders entered in the prior proceedings. *See, e.g.*, *In re Alleyanna C.*, No. E2014-02343-COA-R3-PT, 2015 WL 4773313, at *14 (Tenn. Ct. App. Aug. 10, 2015) (*no perm. app. filed*) (describing the presence of the necessary court order of removal as "the threshold consideration for this statutory ground"); *In re Makenzie L.*, No. M2014-01081-COA-R3-PT, 2015 WL 3793788, at *12 (Tenn. Ct. App. June 17, 2015), *perm. app. denied* (Tenn. Oct. 15, 2015) (considering the sufficiency of the removal order as a threshold matter for the ground of persistent conditions even though it was not raised as an issue by either party on appeal).

DCS concedes on appeal that this ground for termination was not sufficiently proven because of the lack of an appropriate order removing Addison from the home based on a finding of dependency and neglect. The juvenile court's 2013 order did not remove Addison from her home, and the proceedings that were instituted in 2014 were still pending when the termination trial occurred. We therefore vacate the trial court's finding that this ground for termination was proven.

### D.    *Severe Child Abuse*

The next ground for termination found by the trial court was severe child abuse. The termination statute provides that grounds for termination exist when:

> The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian[.]

Tenn. Code Ann. § 36-1-113(g)(4). The trial court independently considered Father's guilty plea, his prior statements to investigating officers, and his testimony at trial

13

regarding the alleged abuse, and the court concluded that Father did in fact digitally penetrate the minor child and commit "what this Court has determined by clear and convincing evidence to be severe abuse" within the meaning of the termination statute.[6] "As set out above, Tennessee Code Annotated Section 36-1-113(g)(4) allows for termination of parental rights when the court that is hearing the petition finds that a party has committed severe child abuse against the child." *In re S.S.-G.*, No. M2015-00055-COA-R3-PT, 2015 WL 7259499, at *9 (Tenn. Ct. App. Nov. 16, 2015) (*no perm. app. filed*).

On appeal, Father continues to assert his innocence and questions whether his conduct would meet the definition of "severe child abuse" provided in Tennessee Code Annotated section 37-1-102(b)(22)(A), which requires "knowing" exposure to abuse or neglect. However, the trial court found that Father did in fact digitally penetrate the child and commit severe child abuse, referencing the definition of "severe child abuse" found in section 37-1-102(b)(22)(C). That subsection references the commission of any act toward the child prohibited by, among other things, Tennessee Code Annotated section 39-13-522, "Rape of a child." We discern no error in the trial court's findings or its conclusion that this ground for termination was proven by clear and convincing evidence.

### E. Sentenced for Child Abuse

The final ground for termination found by the trial court provides:

> The parent or guardian has been sentenced to more than two (2) years' imprisonment for conduct against the child who is the subject of the petition, or for conduct against any sibling or half-sibling of the child or any other child residing temporarily or permanently in the home of such parent or guardian, that has been found under any prior order of a court or that is found by the court hearing the petition to be severe child abuse, as defined in § 37-1-102. Unless otherwise stated, for purposes of this subdivision (g)(5), "sentenced" shall not be construed to mean that the parent or guardian must have actually served more than two (2) years in confinement, but shall only be construed to mean that the court had imposed a sentence of two (2) or more years upon the parent or guardian[.]

Tenn. Code Ann. § 36-1-113(g)(5). The evidence in the record on appeal shows that Father was sentenced to eight years' imprisonment for conduct against Addison that was

---

[6]In the interest of protecting the privacy of the children involved, we do not find it necessary to set out in detail the evidence of sexual abuse against the children that is shown by the record.

found by the trial court to be severe child abuse within the meaning of section 37-1-102. Again, we discern no error in the trial court's determination that this ground was proven by clear and convincing evidence.

Father attacks the validity of his best interest plea and asserts that his conviction could be overturned in the appeal process. However, we have previously rejected the notion that this ground for termination is inapplicable simply because the possibility of an appeal exists. *In re Kason C.*, No. M2013-02624-COA-R3-PT, 2014 WL 2768003, at *3 (Tenn. Ct. App. June 17, 2014) (*no perm. app. filed*) (applying this ground for termination even though the parent's conviction was on direct appeal). "'Statutory grounds may be proved by evidence of conviction, and we find no basis for a requirement that a child remain ineligible for adoption and the possibility of a permanent home while her parent pursues reversal of the conviction.'" *Id.* at *4 (quoting *In re C.M.R.*, No. M2001-00638-COA-R3-JV, 2002 WL 192562 (Tenn. Ct. App. Feb. 7, 2002)).

### B.    Best Interest

Because one or more grounds exist for termination, we now turn to Addison's best interest. Tennessee Code Annotated section 36-1-113(i) provides a list of factors that are relevant when deciding what is in a child's best interest, but the list is not exhaustive. The best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). "[W]hen the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child." *In re Jacobe M.J.*, 434 S.W.3d 565, 573 (Tenn. Ct. App. 2013) (citing Tenn. Code Ann. § 36-1-101(d)). "Facts relevant to a child's best interests need only be established by a preponderance of the evidence, although [the petitioner] must establish that the combined weight of the proven facts amounts to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 535 (citing *In re Kaliyah*, 455 S.W.3d at 555).

Regarding best interest, the trial court found:

> The Court finds that [Father] has shown no adjustment of circumstances which would make it safe and in the child's best interest to be in [his] home or return to [his] custody. A lasting adjustment does not now appear reasonably possible. The parents have not had regular visitation with the child due to the no contact order and they have no meaningful relationship with the minor child. [Father] is serving an effective eight-year

15

sentence upon his guilty plea for attempted child rape, with the victim of one count being the herein child. [Father] will reside in jail until at least 2019. [Father] continues to deny that he digitally penetrated his daughter, the herein minor child. [Mother] knowingly failed to protect the child from sexual abuse by [Father]. . . . The evidence has shown that the minor child has been in a healthy preadoptive home for several months. In the opinion of the Court, the Court finds it is in the best interests of the minor child that the parental rights of [Father] be terminated.

The evidence in the record does not preponderate against the trial court's factual findings, and the combined weight of these facts amounts to clear and convincing evidence that termination of Father's parental rights is in Addison's best interest.

## V. CONCLUSION

For the aforementioned reasons, the decision of the juvenile court is hereby vacated in part, affirmed as modified, and remanded for further proceedings. Costs of this appeal are taxed to the appellant, R.B. Because R.B. is proceeding *in forma pauperis* in this appeal, execution may issue for costs if necessary.

_____
BRANDON O. GIBSON, JUDGE

16