IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 4, 2020

## IN RE: NEVAEH B., ET AL

**Appeal from the Juvenile Court for Knox County**
**No. 172778    Timothy E. Irwin, Judge**

_____

## No. E2019-01539-COA-R3-PT

_____

This appeal arises from the termination of a father's parental rights to his three children. The trial court found by clear and convincing evidence that two grounds for termination were proven and that termination is in the best interest of the children. The father appeals. We affirm and remand for further proceedings.

**Tenn. R App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and FRANK G. CLEMENT, JR., P.J., M.S., joined.

James E. Corcoran, III, Knoxville, Tennessee, for the appellant, Richard S.

Herbert H. Slatery III, Attorney General and Reporter; and Kathryn A. Baker, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

Linda B. ("Mother") has three children, who were born in 2010, 2014, and 2016. Mother was unmarried, and no father was listed on the children's birth certificates. However, she has named Richard S. ("Father") as the putative father of all three children. This appeal only involves Father's parental rights, as Mother's were the subject of a separate proceeding.

It appears that Father and Mother separated around 2016. It is not clear from the record where the children resided thereafter or when the children first became involved with the Tennessee Department of Children's Services, ("DCS"). In early 2018, DCS filed a petition for dependency and neglect and sought a restraining order on the basis that Mother's paramour (Justin E.) and his mother posed a threat of physical abuse to the children. A no-contact order was entered requiring Mother to cease all contact between the children and those individuals. According to the petition for dependency and neglect, Mother was arrested shortly thereafter, in May 2018, and charged with aggravated assault, criminal trespassing, and evading arrest. Father was incarcerated on charges of DUI (second offense) and simple possession. The juvenile court of Knox County entered a protective custody order on May 29, 2018, placing the children in the temporary custody of DCS.

Father was released from incarceration around June 1, but DCS was unaware of his whereabouts and did not have an active telephone number for him. Father was incarcerated again from July 11 to August 7, 2018, for failure to appear on his DUI charge.

The children's case manager finally located Father at an apartment where he lived with a girlfriend in September 2018. The case manager met with Father and discussed a permanency plan, provided him with resources, and reviewed the criteria for termination of parental rights. Father tested positive for morphine on a drug screen on that same date. He returned to jail on October 3, 2018, with charges of criminal trespass and violation of probation.

While Father was in jail, on October 18, 2018, the children were adjudicated dependent and neglected. Father was not present at the hearing because he was incarcerated, but he was represented by counsel at the hearing. The trial court found that the children were dependent and neglected due to Mother's unresolved substance abuse, incarceration, and failure to abide by the no-contact order, as well as Father's "inability to provide appropriate care and supervision as evidenced by his present incarceration."

At some point during this two-month period of incarceration, Father was transferred directly from the jail to an in-patient drug rehabilitation facility. Apparently, he was transferred back to jail and released by mistake in early December. The exact dates of Father's incarceration in early December are unclear. Days after his release in early December, he was arrested for criminal trespassing again and released. Father and his caseworker discussed scheduling a visit with the children while he was out of jail, and they scheduled a visit for December 13. However, Father failed to appear for the visit. The children's case worker later learned that Father had been arrested yet again, on December 13, due to an outstanding warrant for violation of probation on a misdemeanor theft charge. This time, he remained in jail until March 13, 2019.

On or about March 6, 2019, DCS filed a petition to terminate Father's parental rights based on the statutory grounds of abandonment and failure to manifest an ability and willingness to assume custody. The matter was tried on August 16, 2019. Father appeared thirty minutes late but did testify upon his arrival. The trial court also heard testimony from the children's foster father, the DCS case manager assigned to the children, and two other witnesses. By the time of trial, the children had been in DCS custody for over one year.

The DCS case manager for the children, Adam Harmon, testified that Father had no visits with the children during the year they were in foster care and saw them only once at a court hearing the day before trial. Mr. Harmon acknowledged that Father attempted to schedule a visit while briefly out of jail in December 2018 but said he was arrested again before a visit could take place. Father attempted to schedule another visit after the termination petition was filed, but he did not appear for the visit. It appears that Father sent a text message to his case worker stating that he was running late, so the visit was canceled.

Mr. Harmon testified that Father had not done anything that would indicate to him that Father had any desire to be a parent to the children. Mr. Harmon testified that Father was directed to follow up with a local treatment provider after he was treated at the rehabilitation center, and "[i]t was reported to us" that he had started services at a particular facility called Ridgeview. However, Mr. Harmon contacted Ridgeview to verify this, and "they had not heard of him at the time."

Mr. Harmon further testified that the children were placed in a foster home together and doing excellent in their placement. The oldest child was in third grade, the middle child was attending pre-K, and the youngest attended daycare. They were attending therapy and medical appointments for some health conditions. The children's foster father testified as well, expressing his desire to adopt the children if possible. He testified that the children call his wife and him "mom and dad."

Father admitted that he was "in and out of different jails" throughout the time the children had been in foster care. He conceded that he had "quite a few charges" in two different counties and "bounced all over the place." However, he insisted that his repeated arrests were not his fault but the fault of "the police." He testified that he was repeatedly arrested for criminal trespassing for continuing to return to the same apartment complex after he had been banned from the complex. However, Father believed that his actions were not wrongful because the apartment complex had banned him without taking action to evict him. In June 2019, while the termination petition was pending, he had been arrested twice, for violation of probation and criminal trespass. At the time of trial, he had pending charges for simple possession, possession of drug paraphernalia, and trespassing. Although Father attempted to downplay the seriousness of his actions leading to various arrests, he admitted that one of his two DUI charges was due to his

- 3 -

"[s]tupid mistake" of drinking and driving and that his three children were counting on him to stay out of jail. Since the children had entered state custody, Father had tested positive for morphine, benzodiazepines, and methamphetamine. He suggested that the drug tests were faulty but then admitted that he failed to appear for follow-up hair follicle screens requested by DCS. Father testified that he last used illegal or unprescribed substances "a few months" before trial.

Father testified that he did not go to aftercare at Ridgeview because he had a "transportation problem" and said "[t]hey've got to work too." However, he later admitted that Ridgeview was actually within walking distance of his apartment and that his case manager had offered to drive him to appointments or provide him with gas cards. Father admitted that the girlfriend with whom he resided had been arrested on drug charges and was not appropriate for the children to be around, and the apartment where they lived had a significant bug problem. Father had moved out of that apartment and ended his relationship with his girlfriend a couple of months before trial, but he failed to inform his case manager of his new residence or the fact that he no longer had access to his girlfriend's cell phone. Father said, "I never did stay in contact with him because I was being picked back up, picked back up, picked back up by incarceration."

Father had not provided any child support for the children. He was unemployed aside from doing occasional lawn work. Father testified that he had been receiving social security disability income for the past ten years. He explained that he was "hit by a truck," which caused him to suffer from "Anger, ADHD. . . . Like brain damage."

The trial court announced its oral ruling at the conclusion of trial and entered its written order on September 24, 2019. For reasons that will be discussed in more detail below, the trial court found that two grounds for termination had been proven by clear and convincing evidence: abandonment by an incarcerated parent; and failure to manifest an ability to assume custody. *See* Tenn. Code Ann. § 36-1-113(g)(1), (14). The trial court also found by clear and convincing evidence that termination of Father's parental rights was in the best interest of the children. *See* Tenn. Code Ann. § 36-1-113(i). As such, the trial court terminated Father's parental rights to the three children. Father timely filed a notice of appeal.

## II. ISSUES PRESENTED

Father presents the following issues, as we perceive them, for review on appeal:

1. Whether the trial court's order terminating Father's parental rights satisfies the requirements of Tennessee Code Annotated section 36-1-113;

2. Whether the trial court erred in finding abandonment by an incarcerated parent;

- 4 -

3.      Whether the trial court erred in finding failure to manifest an ability and willingness to assume custody; and

4.      Whether the trial court erred in its best interest determination.

For the following reasons, we affirm the decision of the juvenile court terminating Father's parental rights.

### III.    STANDARDS APPLICABLE TO TERMINATION CASES

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). According to the statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, that party must prove the existence of at least one of the statutory grounds for termination set forth in Tennessee Code Annotated section 36-1-113(g). *Id.* Second, the petitioner must prove that termination of parental rights is in the best interest of the child, considering the best interest factors listed in Tennessee Code Annotated section 36-1-113(i). *Id.*

Because of the constitutional dimension of the parent's rights at stake, the party seeking termination must prove both of the required elements by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *see* Tenn. Code Ann. § 36-1-113(c). To be clear and convincing, the evidence must enable the finder of fact "to form a firm belief or conviction regarding the truth of the facts" sought to be established and eliminate "any serious or substantial doubt about the correctness" of the findings. *In re Bernard T.*, 319 S.W.3d at 596.

Due to this heightened burden of proof applicable in parental termination cases, we adapt our customary standard of review on appeal. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). Appellate courts review the trial court's factual findings de novo in accordance with Tennessee Rule of Appellate Procedure 13(d), presuming each factual finding to be correct unless the evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016). Then, we make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

### IV.    DISCUSSION

### A.  *Grounds for Termination*

### 1.  **Abandonment**

The first ground listed in the parental termination statute is abandonment.  *See* Tenn. Code Ann. § 36-1-113(g)(1).  Thus, one ground for terminating parental rights exists if "abandonment" has occurred within the meaning of the statute.  *Id.*  The statutory scheme provides several alternative definitions of abandonment in Tennessee Code Annotated section 36-1-102(1).  Subsection (1)(A)(iv) provides "mechanisms by which abandonment may be proven when the parent is incarcerated at or shortly before the filing of the termination petition." *In re Navada N.*, 498 S.W.3d 579, 597 (Tenn. Ct. App. 2016).  This definition provides that "abandonment" occurs when:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and *either* has failed to visit or has failed to support or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, *or* the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (emphasis added).

In the petition to terminate Father's parental rights, DCS alleged both failure to visit and failure to support during the four months prior to Father's incarceration *and* that he had engaged in conduct prior to incarceration exhibiting a wanton disregard for the welfare of the children.  However, near the end of the termination trial, DCS announced that it was voluntarily dismissing its allegations based on failure to visit and support because of the difficulty in identifying any relevant four months when Father was not incarcerated.  Thus, DCS clarified that it wished to proceed on the basis of abandonment by wanton disregard.

The trial court noted this development in its written order, which states:

> Prior to the close of proof, Petitioner announced that it would not proceed forward under the theory of abandonment by incarceration for failure to visit or support to conform with the proof of Respondent's periods of incarceration; Petitioner elected to proceed under the theory of abandonment by incarceration by exhibiting a wanton disregard for the children which had been properly pled.

- 6 -

Still, on appeal, Father argues that the trial court's written order impermissibly found willful failure to visit and support as a ground for terminating his parental rights.

As support for his argument, Father relies on the fact that the sections of the Tennessee Code referenced in the trial court's order included: "T.C.A. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(iv), -102(1)(B), -102(1)(C), -102(1)(D) and -102(1)(E)." The first two subsections correctly reference the statutory ground of abandonment and the relevant definition for incarcerated parents, but the latter subsections provide definitions of failure to support, failure to visit, token support, and token visitation. Because of these statutory references, Father interprets the order as finding abandonment by failure to visit and failure to support.

After carefully reviewing the entire order, we believe the unnecessary statutory references were simply a scrivener's error. *See, e.g.*, *In re A.W.*, No. M2019-00358-COA-R3-PT, 2020 WL 95690, at *2 n.2 (Tenn. Ct. App. Jan. 8, 2020) (stating the trial court's reference to an inapplicable ground "appear[ed] to have been a scrivener's error"); *In re Alyssa W.*, No. E2017-00070-COA-R3-PT, 2017 WL 6403569, at *7 n.7 (Tenn. Ct. App. Dec. 14, 2017) (concluding that a reference to a particular subsection was "obviously a scrivener's error" when it was "apparent that the court intended to reference" a different subsection). As recited above, the written order unequivocally recognized DCS's announcement that it would not proceed under the theory of failure to visit or support and that it elected to proceed under the theory of abandonment by exhibiting a wanton disregard for the children. Additionally, in the "abandonment" section of the order, the trial court found "clear and convincing evidence that Respondent was incarcerated during the period [of] four months preceding the filing of the petition to terminate his parental rights, and prior to that time, engaged in conduct which exhibited a wanton disregard for his children." The trial court's isolated reference to irrelevant statutory subsections does not change the substance of the trial court's findings.

We now review the substance of the trial court's finding of wanton disregard. Pursuant to the statute, DCS was required to prove that Father was incarcerated when the petition was filed or "during all or part of the four (4) months immediately preceding the institution of such action" and that Father "engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." Tenn. Code Ann. § 36-1-102(1)(A)(iv); *In re Jaydin A.*, No. M2018-02145-COA-R3-PT, 2019 WL 6770494, at *4 (Tenn. Ct. App. Dec. 12, 2019). The term "wanton" means "'[u]nreasonably or maliciously risking harm while being utterly indifferent to the consequences.'" *In re O.W.*, No. W2019-01127-COA-R3-PT, 2020 WL 97727, at *5 (Tenn. Ct. App. Jan. 9, 2020) (quoting *In re Chandler M.*, No. M2013-02455-COA-R3-PT, 2014 WL 3586499, at *4 (Tenn. Ct. App. July 21, 2014)). "'The consequences at issue in termination cases relate to the child's welfare. In other words, the parent must be indifferent to how their conduct may affect their child's welfare.'" *In re Veronica T.*, No. M2017-00726-COA-R3-PT, 2018 WL 1410909, at *7 (Tenn. Ct. App. Mar. 21, 2018) (quoting *In re Chandler*

*M.*, 2014 WL 3586499, at *4).

At the outset, we find that the trial court's nine-page order included sufficient findings to satisfy the termination statute, despite Father's suggestion to the contrary. In finding that Father exhibited a wanton disregard for the welfare of his children, the trial court began by noting that the children were not in Father's care or custody when they were removed from the home of their mother due to the mother's substance abuse, incarceration, and violation of a no-contact order previously entered by the court. The trial court found that Father was incarcerated when the children were removed, due to charges of DUI and simple possession. Father was released but returned to jail shortly thereafter due to his failure to appear in court. The trial court found that when DCS located Father in September 2018, the case manager met with him and discussed his responsibilities under the permanency plan, services available to him, visitation with the children, and the criteria for termination of parental rights. After the meeting with DCS, Father was arrested again on October 3, and he alternated between a drug treatment facility and jail until early December. Within a week or two of his release, Father was "rearrested," in mid-December, and transferred to another county. He remained incarcerated when the petition to terminate parental rights was filed.

The trial court found that Father failed to visit or support the children during his periods of non-incarceration. It also found that he tested positive for morphine, benzodiazepine, and methamphetamine while the children were in foster care, and he failed to appear for additional requested drug screens. The trial court found that Father had convictions for DUI, failure to appear for court, theft, and violation of probation, and he had additional unresolved criminal charges pending at the time of the hearing.

We readily agree with the trial court's conclusion that Father's actions demonstrated a wanton disregard for the welfare of his three children. "Wanton disregard for the welfare of the child can be established by the parent's previous criminal conduct along with a history of drug abuse." *In re S.L.A.*, 223 S.W.3d 295, 299 (Tenn. Ct. App. 2006). "We have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d 838, 867-68 (Tenn. Ct. App. 2005).

On appeal, Father admits that he was incarcerated "during much of the custodial episode," but he suggests that this ground for termination was not sufficiently proven because DCS did not present certified copies of Father's convictions and instead relied on the testimony of Father and the DCS case worker as to the dates of Father's incarceration. Father now suggests that his own testimony was suspect because he is disabled. We find this argument disingenuous at this point because DCS attempted to question the case worker at trial about the records he requested from the jail, and Father's counsel objected,

stating, "My client is here to testify and the questions could be asked of him." Neither Father nor his counsel ever suggested at trial that Father was unable to answer questions due to his disability or brain injury, which Father himself simply described as causing anger and ADHD. We perceive no error in accepting Father's own testimony (as well as the testimony of the case worker) regarding Father's dates of incarceration and extensive criminal history.

Finally, Father suggests that his repeated charges of criminal trespass at the apartment complex should not be considered as exhibiting wanton disregard because Father believed that he could not be banned without an eviction. He argues on appeal that DCS was required to present "some extrinsic evidence that the father did not have a right to be present under the Uniform Residential Landlord and Tenant Act." This argument misses the point. As the trial judge aptly noted during his oral ruling, regarding Father's "refusal to stop going" to the apartment complex where his girlfriend resided, "Whether he is correct or not, he kept trying to go back on that property [to] the detriment of his children. Whatever was going on with that situation was more important than staying out of jail and being there for his kids."

"The actions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015). Father's conduct exhibited just such an indifference and wanton disregard for the welfare of his three children. This ground for termination was sufficiently proven.

### 2. Failure to Manifest Ability & Willingness

Tennessee Code Annotated section 36-1-113(g)(14) provides another ground for termination that applies when:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

This ground was added to the statute effective July 1, 2016, and because of its recent enactment, relatively few cases have considered this particular ground for termination. *In re Colton B.*, No. M2018-01053-COA-R3-PT, 2018 WL 5415921, at *9 (Tenn. Ct. App. Oct. 29, 2018) *perm. app. denied* (Tenn. Jan. 22, 2019).

Under this ground for termination, the petitioner must prove two elements by clear and convincing evidence. *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL

1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018). First, the petitioner is required to prove that the parent has failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child." Tenn. Code Ann. § 36-1-113(g)(14). Second, the petitioner is required to prove that placing the child in the parent's custody "would pose a risk of substantial harm to the physical or psychological welfare of the child." *Id.*

Initially, there was a "split in authority" as to how the first element was proven. *See In re Colton B.*, 2018 WL 5415921, at *9. "In *In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018), a panel of this Court concluded that the first prong of the statute requires the petitioner to prove both an inability *and* an unwillingness of the parent to assume custody or financial responsibility for the child." *Id.* Because the parents at issue *wanted* custody, this negated a required element of the ground. *In re Ayden S.*, 2018 WL 2447044, at *7.

Another panel of this Court respectfully disagreed with that approach in *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *14 (Tenn. Ct. App. June 20, 2018), holding, instead, that

> [T]he first prong of Tennessee Code Annotated § 36-1-113(g)(14) requires that the petitioner prove that a parent has failed to meet the requirement of manifesting both a willingness and an ability to assume legal and physical custody of the child or has failed to meet the requirement of manifesting both a willingness and an ability to assume financial responsibility of the child.

Stated differently, "the parent must have 'manifest[ed], by act or omission, an ability <u>and</u> willingness.'" *Id.* at *13 (quoting Tenn. Code Ann. § 36-1-113(g)(14)).

Recently, members of this panel have endorsed the latter approach adopted in *In re Amynn K. See, e.g.*, *In re H.S.*, No. M2019-00808-COA-R3-PT, 2020 WL 1428777, (Tenn. Ct. App. Mar. 20, 2020) ("After careful consideration of the conflicting authorities, we accept DCS's invitation to follow the holding of *In re Amynn K.*"); *In re Jayda H.*, No. E2019-00855-COA-R3-PT, 2019 WL 6320503, at *9 (Tenn. Ct. App. Nov. 25, 2019) ("[C]onsistent with the discussion in the *In re Amynn K.* decision, we do not view a parent's demonstration of 'willingness' as fatal to this ground when accompanied by a failure to manifest the requisite 'ability.'"); *see also In re Bentley Q.*, No. E2019-00957-COA-R3-PT, 2020 WL 1181804, at *10 (Tenn. Ct. App. Mar. 11, 2020); *In re Serenity S.*, No. E2019-00277-COA-R3-PT, 2020 WL 522439, at *16 (Tenn. Ct. App. Jan. 31, 2020); *but see In re Neveah M.*, No. M2019-00313-COA-R3-PT, 2020 WL 1042502, at *16 (Tenn. Ct. App. Mar. 4, 2020) (following *In re Ayden S.* with one judge concurring in results only).

We also find guidance in our supreme court's decision in *In re Bernard T.*, 319 S.W.3d 586, 604 (Tenn. 2010), wherein the Court considered a similar ground for termination, applicable to putative fathers, which applies when "[t]he person has failed to manifest an ability and willingness to assume legal and physical custody of the child[.]" Tenn. Code Ann. § 36-1-113(g)(9)(A)(iv). The Court affirmed termination under this ground where the father had "manifested a commendable willingness to assume legal custody of all the children" but "conceded that he was unable to support the children financially and that he could not provide them with a stable residence." *Id.* According to the Court, "This testimony alone provide[d] clear and convincing evidence that [the father] [did] not presently have the ability to assume legal and physical custody of any of the children." *Id.* at 604-05.

Applying the interpretation in *In re Amynn K.*, DCS was required to prove that Father "failed to meet the requirement of manifesting both a willingness and an ability to assume legal and physical custody of the child or has failed to meet the requirement of manifesting both a willingness and an ability to assume financial responsibility of the child." 2018 WL 3058280, at *14. The trial court found that Father failed to manifest an ability to assume custody of the children because he continued to use drugs, having tested positive for morphine, benzodiazepine, and methamphetamine since the children entered state custody; he failed to appear for additional drug screens; he failed to visit or support the children during periods of non-incarceration; he was convicted of DUI, theft, failing to appear for court, and violation of probation; and he had additional unresolved criminal charges still pending at the time of trial. When analyzing a parent's ability to assume custody, we focus on his or her "lifestyle and circumstances." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018). We agree with the trial court's conclusion that Father's acts and omissions failed to manifest an ability to assume custody of his three children.

Although it is not necessary to reach the issue under *In re Amynn K.*, we also note that Father has not demonstrated a willingness to assume custody either. It is important to note that the statute does not focus on a parent's bare subjective claim of willingness. Instead, it asks whether the parent "has failed *to manifest, by act or omission*, . . . [a] willingness to personally assume legal and physical custody[.]" Tenn. Code Ann. § 36-1-113(g)(14). In assessing a parent's willingness, "'we look for more than mere words.'" *In re Jaxx M.*, No. E2018-01041-COA-R3-PT, 2019 WL 1753054, at *9 (Tenn. Ct. App. Apr. 17, 2019) (quoting *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019)). A lack of effort can undercut a claim of willingness. *Id.*; *see, e.g.*, *In re Antonio J.*, No. M2019-00255-COA-R3-PT, 2019 WL 6312951, at *9 (Tenn. Ct. App. Nov. 25, 2019) ("While Mother's words have indicated that she is willing to resume custody and financial responsibility for her children, her actions have betrayed her unwillingness to make the effort required for reunification.") "Parents must have demonstrated their willingness by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the

child." *In re Jonathan M.*, 2018 WL 5310750, at *5.

Here, Father admittedly had no explanation for why he failed to report for hair follicle drug screens or failed to meet the minimal requirement of notifying his case worker of his change in residence and telephone number. The children's case worker testified that Father had not done anything to indicate to him that he had any desire to be a parent to the children. As Father put it, "I never did stay in contact with him because I was being picked back up, picked back up, picked back up by incarceration." Notably, even at the termination trial, Father never expressed any willingness or desire to regain *custody* of the children or described any plan for how he might do so. His attorney simply asked:

> Q. It's your desire now currently to be able to *see* your children?
> A. Yes, sir.
> Q. Is there anything else that you want the Judge to know about that you haven't already had the opportunity to tell him with regards to the termination?
> A. No, sir.

(emphasis added). Father's actions and omissions indicate that he is not willing *or* able to personally assume custody or financial responsibility for the children. Therefore, the first element of this ground for termination has been established under either approach.

The second part of the analysis asks whether placing the child in the parent's custody "would pose a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14). The children had not visited with Father in over one year at the time of trial. Recognizing that stability is extremely important for children, this Court has found this prong sufficiently proven under similar circumstances when removal from the current family and placement with a near-stranger in an unstable living situation would risk emotional harm. *In re Antonio J.*, 2019 WL 6312951, at *9-10; *see, e.g.*, *In re Bentley Q.*, 2020 WL 1181804, at *12 ("Father's lack of presence in the Child's life posed a sufficient probable risk of substantial harm to the Child's psychological welfare if Father were to suddenly obtain custody of the Child."). Additionally, we have held that "'placing a child with a parent who ha[s] knowingly engaged in repeated criminal conduct that necessitated [the parent's] re-incarceration would place the child at risk of physical or psychological harm." *In re O.M.*, No. E2018-01463-COA-R3-PT, 2019 WL 1872511, at *4 (Tenn. Ct. App. Apr. 26, 2019) (quoting *In re Amynn K.*, 2018 WL 3058280, at *15). Due to Father's instability, continued drug use, unresolved criminal charges at the time of trial, and the lack of any meaningful relationship between Father and the children, we agree that this element was sufficiently proven.

### B. Best Interest

When at least one ground for termination has been proven by clear and convincing evidence, "the court next determines whether the proof amounts to clear and convincing evidence that terminating parental rights is the best interests of the child." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (citing *In re Carrington H.*, 483 S.W.3d at 523). Courts consider nine statutory factors set forth in Tennessee Code Annotated section 36-1-113(i) when conducting the best interest analysis. *Id.* In doing so, we must bear in mind that the child's best interest must be viewed from the perspective of the child, not the parent. *Id.* If the best interest of the child and the interest of the adults conflict, such conflict must always be resolved in favor of the child. *Id.* at 681-82.

The trial court found that Father had not made changes in his circumstances that would make it safe for the children to return to his home, as he was still using drugs, he had not adequately addressed his substance abuse or mental health needs, he was "in and out of incarceration," he lacked stable housing, transportation, or income, and he completed none of the requirements of the permanency plan. The trial court found that lasting change does not appear possible despite reasonable efforts by DCS. The court noted that Father had not maintained regular visitation with the children, so there was no meaningful relationship remaining between them. The trial court found that Father had shown little or no interest in the welfare of the children. The court found that changing caretakers at this stage would have a detrimental effect on the children. The children were placed together in a foster home, where they were doing well and making improvements. The children were strongly bonded with their foster family, and the foster parents desired to adopt them. Considering all of these facts, the trial court found clear and convincing evidence that termination of Father's parental rights was in the best interest of the children.

The evidence supports the trial court's factual findings, and we likewise find clear and convincing evidence to support the trial court's conclusion that termination is in the best interest of the children.

## V. CONCLUSION

For the aforementioned reasons, the decision of the trial court is affirmed and remanded. Costs of this appeal are taxed to the appellant, Richard S., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE